# EXHIBIT 1

 1                UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF FLORIDA
 2                   PENSACOLA DIVISION

 3

 4   IN RE: 3M COMBAT ARMS      )
     EARPLUG PRODUCTS           )
 5   LIABILITY LITIGATION       )
                                )
 6   This Document Relates to: ) Case No.
     Shanika Roper              ) 3:19-md-2885-MCR-GRJ
 7                              )
                 Plaintiff      ) Judge M. Casey Rodgers
 8                              ) Magistrate Judge Gary R.
     Case No.                   )                    Jones
 9   7:20-cv-02945-MCR-GRJ      )
                                )
10   -------------------------)

11

12

13          THE VIDEO TELECONFERENCE DEPOSITION OF

14   RICHARD S. TYLER, Ph.D., taken before Kristi L.

15   Miller, Certified Shorthand Reporter and Notary

16   Public, commencing at 9:00 a.m., C.S.T., July 1,

17   2022, with all parties appearing remotely.

18

19

20

21

22        Reported by:  Kristi L. Miller, C.S.R.

23

24             GOLKOW LITIGATION SERVICES
           877.370.3377 ph | 917.591.5672 fax
25                  Deps@golkow.com

1    of your case-specific expert report; correct?

2    Do I need to make that larger?  I can't see how

3    large it is on your screen.

4         A.   Yeah, a little bit larger would help.

5         Q.   Sure.  Let me see if I can do that.

6    Is that better?

7         A.   Oh, much better, yes.

8         Q.   So this is the First Amended

9    Case-Specific Report of Doctor Richard Tyler.

10              Is this the amended report that

11   was served, I believe, yesterday?

12        A.   I believe that's correct, yes.

13        Q.   Okay.  And so I'm just going to scroll

14   down quickly.  I'm not asking you to read this

15   as I go, obviously.  And just down to page 12

16   of your -- the numbered page 12, and that's

17   your signature; correct?

18        A.   Yes, it is.

19        Q.   And dated yesterday?

20        A.   That's correct, yes.

21        Q.   And so what changes did you make to

22   your report between the first report and this

23   amended report?

24        A.   Can we go --

25              MR. BAUER:  Can I interject?

1   that you intend to testify to at trial, if we

2   go to trial in this case?

3       A.   Yes, it does.

4       Q.   Okay.  Other than counsel, did you

5   consult anyone as you were preparing this

6   report?

7       A.   No, I did not.

8       Q.   On page 1 of this report under Summary

9   of Opinions here, it states that you relied

10  upon the general causation opinions of Rich

11  McKinley, Mark Packer, Christopher Spankovich,

12  and refer to them as the general experts.

13               What did that review entail for

14  you?

15      A.   Well, they each had quite lengthy

16  reports, and so I read those reports carefully.

17  Several times, actually.

18      Q.   And did you read those reports

19  specifically for this case or generally for all

20  of the 3M cases?

21      A.   Well, I --

22               MR. BAUER:  Objection, form.

23      A.   I reread them for this case as well.

24      Q.   And you're relying on those reports

25  for your opinions today; correct?

1    A.   Well, I considered those.  I'm not

2  sure exactly what you mean by "rely."

3    Q.   Let me put it this way:  You've

4  reviewed these reports, but they're not -- the

5  opinions expressed in those reports are not

6  opinions that you're holding out as your own or

7  plan to offer in this particular case; correct?

8    A.   That's correct.  They were certainly

9  relevant to my opinions, but I don't hold their

10  opinions as my opinions.

11    Q.   Understood.  Did you review all of the

12  underlying documents and citations related --

13  that were listed in these general reports?

14    A.   Yes, I did.

15    Q.   Okay.  Did you do any formal analysis

16  or independent research to determine if there

17  were contrary opinions to those expressed in

18  these reports?

19    A.   Well, I did some Google searches on

20  the topics, but I can't say that I've actually

21  seen anything that has directly opposed these

22  reports.

23    Q.   So you haven't reviewed, for example,

24  any of the other -- any of the defense general

25  expert reports?

 1  fair to say, specific to this case following

 2  that same caveat?

 3      A.   Well, again, it might depend on what

 4  the definition of "specific to this case" is,

 5  but I could generally agree with you.

 6      Q.   That's fair.  Have you reviewed all of

 7  the available medical records in this case?

 8      A.   I believe that I have, yes.

 9      Q.   Okay.  Do you agree that it's

10  important to analyze all of the available

11  medical records to form your opinions on a

12  patient's medical state?

13      A.   Yes, I do.

14      Q.   Okay.  And do you believe that you've

15  been provided all of the information necessary

16  to reach your opinions in this case?

17      A.   Yes, I do.

18      Q.   Okay.  Did you make any independent

19  effort, meaning aside from what was provided to

20  you by counsel, to get any records other than

21  those provided to you by Mr. Bauer or any other

22  plaintiffs' attorney?

23              MR. BAUER:  Objection, form.

24      A.   I did talk with the plaintiff, and I

25  thought that was important.

1      Q.   Oh, absolutely.  I'm speaking

2   specifically to this Exhibit A at this point.

3      A.   Oh.

4      Q.   Do you know approximately how many

5   pages of medical records you received and

6   reviewed in this case?

7      A.   No, I do not.

8      Q.   Okay.  So I think I did some

9   back-of-the-envelope math, and you've listed on

10   this list, let's say, around between 30 and

11   50 pages of medical records on this list.

12               Is that a fair sort of addition

13   of the Bates numbers on here?

14      A.   I'd guess that's correct, yes.

15      Q.   Were there other medical records

16   provided or just these?

17      A.   With respect to this particular case,

18   just these.

19      Q.   Would it surprise you to know that

20   there are over 6,164 pages of medical records

21   received from the VA and Department of Defense

22   related to this plaintiff?

23      A.   Well, I guess that large number would

24   surprise me, yes.

25      Q.   So granting that we have 30 to 50

1  pages listed here, you haven't reviewed the

2  other 6,114 pages of those records; is that

3  fair?

4              MR. BAUER:  Objection, form.

5      A.  Well, I don't know what all the

6  records are, but I'm sure a lot of them are not

7  related to hearing and tinnitus and

8  hyperacusis, so certainly, as I said, these are

9  the ones that I reviewed.

10     Q.  That's fair.  Did you review any of

11  the over 300 pages that were retrieved from

12  Ms. Roper's Tricare patient portal?

13     A.  I don't have a recollection of that.

14  I'd have to look at them.

15     Q.  Okay.  So did you ask for any

16  documents in addition to the 30 to 50 pages

17  that you have mentioned here, plus the other --

18  the deposition and the DME data?

19     A.  No, I did not.

20     Q.  Okay.  So you didn't review

21  plaintiff's records related to her arthralgia

22  of bilateral temporomandibular joint?

23              MR. BAUER:  Objection, form.

24     A.  That's correct.

25     Q.  You didn't review any records related

1    to the plaintiff's major depressive disorder?

2        A.   Well, I understand she was going

3    through some other things, but I did not review

4    those, no.

5        Q.   Okay.  You haven't reviewed the

6    transcript of the deposition of plaintiff's

7    ex-husband Calvin Lockwood; correct?

8        A.   I'd have to check the records if I

9    did, but I don't remember that.

10       Q.   Okay.  So in this case you reviewed

11   the records that were provided to you by

12   plaintiff's counsel and you didn't ask for any

13   additional records; is that fair?

14       A.   Yes, that's fair.

15       Q.   Okay.  And the plaintiff in this case

16   is Shanika Roper; correct?

17       A.   Correct.

18       Q.   Okay.  I'm going to scroll back up

19   here to the -- I believe it's the bottom of

20   page 1 here of your report.  I'm going to read

21   this last sentence.

22                It says, "These flaws and the

23   resulting inadequate fit, seal and/or continued

24   seal/retention and the imperceptible loosening

25   of the CAEv2 in Plaintiff while exposed to

1      Q.   Okay.  But with respect to your

2  telehealth visit with the plaintiff, you didn't

3  perform any tests to diagnose tinnitus based on

4  your statement that there aren't any tests to

5  diagnose subjective tinnitus; is that fair?

6      A.   That's correct, yes.

7      Q.   Okay.  Earlier you mentioned that you

8  don't necessarily follow the belief that there

9  may be a genetic component to tinnitus; is that

10  correct?

11      A.   That's correct, yes.

12      Q.   Do you believe there is any genetic

13  component to hyperacusis?

14      A.   There may be.  This has not been well

15  described yet, but I'm not aware of any good

16  data that indicates that it is.

17      Q.   Okay, gotcha.  In your practice do you

18  ever fit patients with hearing protection

19  devices?

20      A.   I often pass out some earplugs, but I

21  don't fit them or guide them along those lines.

22      Q.   Would those be sort of like the foam

23  roll-type earplugs?

24      A.   They would, yes.

25      Q.   Okay.  Do you perform any testing when

1   you hand out those earplugs, any sort of

2   measurements of the ear canal or fit tests?

3       A.   No, I do not.  I think they generally

4   fit a wide range of people.  There's not a lot

5   of, wide range of ear canal sizes.  And I use

6   them on a very regular basis and they're quite

7   easy to insert and expand and cover your ear

8   canal quite nicely.

9       Q.   Okay.  Do you train patients on how to

10  insert hearing protection devices such as the

11  earplugs you just mentioned?

12      A.   No, I don't.  As I said, it's pretty

13  straightforward.

14      Q.   Okay.  And you noted in your expert

15  report that you have inserted the Combat Arms

16  Earplugs Version 2 into your own ears; is that

17  correct?

18      A.   That's correct, yes.

19      Q.   And what's the proper method of

20  inserting those earplugs into the ear?

21      A.   Well, I'd have to go back and look at

22  the directions again, but my memory is you

23  reach one hand over your head, pull up on the

24  back of your ear lobe and then insert the

25  flange with your other hand directly into your

1  that you've rendered in this case are related

2  solely to this case and not to any of the other

3  3M cases; correct?

4      A.  That's correct, yes.

5      Q.  All right.  Thank you.  Doctor Tyler,

6  when you conducted your interview with the

7  plaintiff in this case, did you ask the

8  plaintiff to demonstrate how she used the

9  Combat Arms Earplugs Version 2 when she was in

10  the service?

11      A.  No, I did not.  I did not think that

12  was relevant.

13      Q.  Why wouldn't that be relevant, in your

14  opinion?

15      A.  Well, she was provided instructions on

16  how to do it.  My understanding is instructions

17  came with these devices.

18              And even if she had put them in

19  properly, they were known to come out on their

20  own, and just watching her put them in once

21  wouldn't really document accurately how well

22  she put them in for her time in the military.

23      Q.  Let's see here.  And, similarly, you

24  didn't personally observe the plaintiff insert

25  any other type of earplug or use any other type

1    of hearing protection; correct?

2       A.   Well, my understanding is there's no

3    other concerns within the companies or within

4    the field in general that any other earplugs

5    come out after they're inserted correctly or

6    incorrectly, so I'm not sure -- I did not do

7    that, no.

8            MR. OLSON:   I'm going to move to

9    strike the nonresponsive portion.

10      Q.   So just to clarify then, you've never

11   examined the fit of plaintiff wearing any form

12   of hearing protection device; is that fair?

13      A.   Well, as I said, I did not think that

14   was relevant, so I did not do that, no.

15      Q.   Okay.   And you didn't do any

16   examination of the plaintiff's ear canals or

17   anything like that to determine any questions

18   related to fit; correct?

19      A.   I think the 3M earplugs in question

20   were designed to fit a wide range, and I don't

21   know that there's any -- there's not a wide

22   range of ear canals in adults anyways, and it's

23   never an issue that I'm aware of in hearing

24   protection use.   Very rarely anyways.

25      Q.   Okay.   Do you ever or have you ever

1  made molded ear impressions of an individual's

2  ear canals?

3      A.   I probably have a long time ago for

4  fitting hearing aids.

5      Q.   You didn't of this plaintiff; correct?

6      A.   No, I did not.

7      Q.   So just to clarify, you also haven't

8  reviewed any records describing the

9  measurements of plaintiff's ear canals;

10  correct?

11            And I understand that you didn't

12  think it was relevant, but just you haven't

13  reviewed those; correct?

14      A.   I wasn't aware there were any of those

15  measurements.

16      Q.   Okay.  And so what methodology did you

17  use to reach your opinions that you've rendered

18  in this case?

19      A.   Well, my opinions on the inadequacies

20  of the 3M earplugs in question were based on

21  the internal documents of the 3M engineers

22  requesting that they be recalled to their

23  supervisors, the supervisors not doing that

24  and, therefore, the earplugs could come out and

25  not be effective, and the notion that even

1    short-term direct exposure -- short-term

2    exposure to intense impulsive noise can create

3    tinnitus and hyperacusis.  It can even just be

4    one event.  And I relied on my interactions

5    with the client and her discussions of her

6    reactions with her tinnitus and her

7    hyperacusis.

8        Q.   Okay.  Your expert opinion reflects

9    that you conducted a differential diagnosis; is

10   that correct?

11       A.   Well, it depends how you define a

12   "differential diagnosis."  As I said, I was not

13   present with her.  I don't think there's any

14   question that she doesn't have any other ear

15   disease or medical condition that relates to

16   the tinnitus or hyperacusis.

17       Q.   What I mean by conducting a

18   differential diagnosis was you considered

19   certain potential causes for her tinnitus, and

20   then you ruled out all the causes but the

21   Combat Arms Version 2 Earplugs; is that

22   correct?

23       A.   Well, I thought that was the most

24   probable cause in this case.

25       Q.   Okay.  Did you assign a percentage to

1  how likely you thought that the Combat Arms

2  Earplugs caused her injuries in this case?

3      A.    No, I did not think that was

4  necessary.

5      Q.    Okay.  If you were to assign a

6  percentage of contribution to the Combat Arms

7  Earplugs Version 2, would that percentage be

8  100 percent, or would it be something less?

9               MR. BAUER:  Objection, form.

10     A.    Well, I would not do that.  It's not

11  possible to know anything with 100 percent

12  accuracy in situations like this.

13     Q.    So there's the possibility of other

14  contributing causes?

15     A.    Yes, I can agree with that.

16     Q.    And are you offering the opinion that

17  the plaintiff would have no tinnitus but for

18  her use of the Combat Arms Earplugs Version 2?

19               MR. BAUER:  Objection, form.

20     A.    Well, again, my understanding was that

21  I only had to be 51 percent sure about that.

22  And so I could say that exposure to noise was

23  the most likely cause here while using these

24  defective earplugs.

25     Q.    And would you agree that the plaintiff

 1                    I think we can both agree that

 2    the report of an M16 would be considered to be

 3    a "loud noise"; is that fair?

 4        A.    Yes.   Likely an impulsive noise, yes.

 5        Q.    I can stipulate to that for these

 6    questions at least.   The same for an M9 pistol?

 7        A.    That's correct, yes.

 8        Q.    Okay.   Do you know how often the

 9    plaintiff would train with these firearms?

10        A.    No, I do not.

11        Q.    Do you know what hearing protection

12    the plaintiff used when she was training with

13    these firearms?

14        A.    My recollection is from the review

15    that I said it was not clear what she was

16    using, but I don't know the answer to that.

17        Q.    So we can't be sure today that the

18    plaintiff was using the Combat Arms Earplugs

19    every time she utilized the M16 and M9 firearms

20    at the firing range; is that fair?

21        A.    Yes, I agree with that.

22        Q.    Okay.   And, in fact, I think she

23    testified in her deposition that she used foam

24    earplugs on at least one or two occasions; is

25    that correct?

1      A.    I believe that's true, yes.

2      Q.    Did you consider the amount of times

3   that the plaintiff trained with those firearms

4   when you were rendering your opinion that her

5   tinnitus is the result of the Combat Arms

6   Earplugs?

7                MR. BAUER:  Objection, form.

8      A.    My recollection is it was not clear

9   exactly how many times or how many impulses she

10  was exposed to, so I only did that in a general

11  way.

12     Q.    And those are things that you would

13  need to know to be able to render that opinion,

14  correct, the number times and the number of

15  shots?

16     A.    Well, it would help to be more

17  specific, but I wouldn't say it's essential to

18  understand.  You know, as I said, somebody can

19  get tinnitus or hyperacusis or hearing loss

20  from a single gunfire, so it's different in

21  different people, too.

22     Q.    Perfect.  And so you'd need to know --

23  but you'd certainly need to know to render that

24  opinion when the plaintiff had used the Combat

25  Arms Earplugs versus other hearing protection;

1  is that fair?

2     A.   Well, that would be relevant in this

3  case, yes.

4     Q.   And so you just testified that, you

5  know, one report or one exposure to a loud

6  sound can cause hyperacusis or tinnitus; is

7  that correct?

8     A.   That's correct, yes.

9     Q.   So if we don't know that, for example,

10  the plaintiff utilized the Combat Arms Earplugs

11  in every situation, then we don't know for sure

12  that her hearing -- or that her tinnitus and

13  hyperacusis were caused by those earplugs; is

14  that correct?

15            MR. BAUER:  Objection, form.

16     A.   Well, I guess one could say that we

17  don't know with 100 percent certainty, but as

18  far as I know the 3M earplugs in question were

19  the only ones identified as being faulty and

20  would come out over time.

21     Q.   Have you reviewed any internal

22  documents from any other manufacturers of

23  earplugs?

24            MR. BAUER:  Objection, form.

25     A.   Well, as I said, I'm not aware that

 1   any of them have been recalled, so I'm not sure

 2   that's relevant.  I think that particularly

 3   with what's going on now with the faulty 3M

 4   earplugs, if there was some internal reports,

 5   the companies would call them back as soon as

 6   possible.

 7                  MR. OLSON:  I'm going to move to

 8   strike that as nonresponsive.

 9                  MR. BAUER:  How is that not

10   responsive to your ridiculous question?

11                  MR. OLSON:  I'm going to ask

12   counsel to avoid from characterizing the

13   question.

14       Q.   My question was, have you reviewed the

15   internal documents of any other company that

16   manufactures hearing protection devices?

17                  MR. BAUER:  Objection, asked and

18   answered.  Move on.  That doesn't matter.

19                  THE WITNESS:  Should I respond?

20                  MR. OLSON:  Are you instructing

21   Doctor Tyler not to answer that question?

22                  MR. BAUER:  He already answered

23   your question, so move on.

24       Q.   Well, then let me clarify.  Doctor

25   Tyler, that's a no; correct?

1  relevant time period that she would go to the

2  range and shoot recreationally as well; is that

3  correct?

4      A.  Yes, that's correct.

5      Q.  Do you know what hearing protection

6  devices the plaintiff used when she was

7  shooting recreationally?

8      A.  No, I do not.

9      Q.  All right.  Do you know whether the

10 plaintiff used hearing protection devices while

11 she was shooting recreationally?

12     A.  I don't recall specifically.  I think

13 when I did talk to her about this she said she

14 wore them sometimes, but not all the time.

15     Q.  Okay.  Are you aware that the

16 plaintiff attended athletic events, let's say,

17 professional athletic events with her

18 ex-husband, Calvin Lockwood?

19     A.  Yes.

20     Q.  And you're aware that she attended

21 Atlanta Falcons games; correct?

22     A.  Yes.

23     Q.  Let's see here.  Are you aware of

24 the research indicating that the average

25 decibel level at an NFL game ranges from 85 to

1  110 decibels with an average decibel level of

2  95?

3      A.   So that's a clear example about

4  whoever reported that doesn't know how to

5  measure sound.  Sound is not measured in

6  decibels.  It has to have a unit associated

7  with it.

8      Q.   Okay.  So are you aware of a situation

9  where the Atlanta Falcons, which was the NFL

10  games that the plaintiff attended, were fined

11  by the NFL for piping in additional crowd noise

12  over the PA system?

13              MR. BAUER:  Objection, form.

14      A.   I don't recall that, but I think I

15  might recall that basically.  I'm not sure.

16      Q.   Do you know whether the plaintiff wore

17  hearing protection devices while she attended

18  the Atlanta Falcons games?

19      A.   I don't recall exactly.  I do not

20  think she did, but I'm not sure.

21      Q.   Okay.  Did you consider the noise

22  exposure at NFL games in your differential

23  diagnosis?

24      A.   I did, yes.  It's usually not

25  impulsive noise and it's usually not, you know,

1  mail building that it was once hit by an

2  explosion; is that correct?

3      A.   I believe that's true, yes.

4      Q.   Do you know whether the plaintiff wore

5  hearing protection devices while she was

6  working in the mail building?

7      A.   My recollection is that she did not.

8      Q.   Do you know about the setting of the

9  mail building in Iraq?

10     A.   I'm not sure I understand your

11  question.

12     Q.   Are you aware that the mail building

13  where the plaintiff worked was at Baghdad

14  International Airport?

15     A.   I'm sorry.  Could you repeat that,

16  please?

17     Q.   Are you aware that the mail building

18  where the plaintiff worked was at Baghdad

19  International Airport?

20     A.   That sounds familiar, yes.

21     Q.   And you're aware that Ms. Roper lived

22  in that building along with working in that

23  building; correct?

24     A.   That sounds familiar, yes.

25     Q.   Okay.  You said you haven't reviewed

1  Mr. Lockwood's deposition testimony; is that

2  correct?

3    A.   I don't recall if I did or not.

4    Q.   Okay.  In his testimony -- and let me

5  know if you'd like me to bring it up.  I

6  certainly can.

7            He described the building which

8  is located at Baghdad International Airport as

9  being the site of constant explosions, rocket

10  fire, and small arms fire and described the

11  situation where a plane was hit by a mortar

12  while it was on the tarmac.

13            Are you familiar with that?

14            MR. BAUER:  Objection, form.

15  Show that to him.

16    Q.   Okay.  I'll come back to that after

17  our next break so I don't waste time pulling it

18  up, so I'll come back to that then.

19    A.   Okay.

20    Q.   A few minutes ago I showed you the

21  plaintiff's response to Interrogatory 6, and

22  the other was -- we talked about the gun ranges

23  or the firing ranges, excuse me, and she also

24  indicated in that response that her exposure

25  was to military vehicles; is that correct?

 1          MR. BAUER:  If you're asking

 2    about Interrogatory 6, please show it to him.

 3          MR. OLSON:  Okay.  Not a

 4    problem.

 5      Q.   All right.  Doctor Tyler, I have that

 6    document I just showed you a little while ago,

 7    and I'm just highlighting the portion that I'm

 8    referring to here for your reference noting

 9    that she was exposed to noise-producing devices

10    while in the military while she was at the gun

11    range or during trips in military vehicles.

12          And I paraphrased slightly, but

13    I think that's a fair statement; is that

14    correct?

15      A.   I see that, yes.

16      Q.   Let's see here.  Do you recall the

17    plaintiff's testimony regarding what hearing

18    protection devices she used while she was

19    driving the Humvee to pick up mail?  Or excuse

20    me.  I believe she was riding in it.  I don't

21    believe she drove.

22      A.   I do not recall that, no.

23      Q.   And do you recall that when Ms. Roper

24    was working in the mail building that she

25    described being exposed to the noise from a

1    military forklift?

2        A.   Yes, I recall that.

3        Q.   And earlier we had noted that she

4    wasn't wearing hearing protection when she was

5    working in that mail building.

6              Are you aware of the level of

7    noise exposure that could be caused by that

8    military forklift?

9        A.   Well, it would depend precisely on the

10   distance, and I presume the forklift -- I

11   haven't seen any data on the dBA levels

12   produced by that, and it's not clear how long

13   during the day and how close she would be to

14   the forklift, so --

15       Q.   Okay.

16             MR. BAUER:  I objected on mute.

17   Sorry.  Objection, form.

18             MR. OLSON:  Okay.  Fair enough.

19       Q.   Do you recall that the plaintiff

20   testified that she would wear the Combat Arms

21   Earplugs while she was -- at least some of the

22   time while she was on the firing ranges?

23             Do you recall which end she wore

24   at the time?

25       A.   No, I did not -- I think that was in

1  the instructions and, again, I think that

2  either end that went in could come out and not

3  be effective.

4      Q.   With respect to the plaintiff's

5  training sessions on the firing range, would

6  you have recommended plaintiff use double

7  hearing protection while she was on the firing

8  range?

9      A.   Well, I could say on the one hand that

10  it would be useful if they knew what the

11  impulsive noise was and then that would be a

12  very clear response or clear guidance offered.

13                On the other hand, I can say

14  that hearing is so important and you don't want

15  to get tinnitus and hyperacusis that in all

16  situations where you were aware you were going

17  to be exposed to intense noise and you had the

18  ability to wear double hearing protection, that

19  would certainly be advisable.

20      Q.   Were you aware of the number of

21  service members that were simultaneously

22  participating in weapons fire at the ranges

23  when the plaintiff was firing weapons?

24      A.   I don't recall that.

25      Q.   Same question, but when the plaintiff

1    was shooting recreationally.

2              MR. BAUER:  Objection, form.

3       A.   I'm not sure why this is a relevant

4    question.  I don't understand the question

5    perhaps.

6       Q.   Okay.  The number of -- just in terms

7    of noise exposure, you'd agree that the dose of

8    noise that an individual was receiving depends

9    on a number of factors, including perhaps, as

10   we discussed earlier, the number of shots that

11   are fired, sort of the volume of noise

12   produced, whatever the units you want to use

13   are, by the firearms, but then also the number

14   of other service members that are firing

15   weapons at the same time?

16              I'm asking you whether that last

17   piece is fair.

18      A.   I'm sorry.  Yes, that is important,

19   yes.

20      Q.   And we don't know the answer to that

21   question today, do we?

22      A.   That's correct, we do not.

23      Q.   Either for the military or for when

24   she was shooting recreationally?

25      A.   That's correct, yes.

 1                    And then it goes on to note that

 2    the deuce and a half is slang for a

 3    two-and-a-half-ton truck.  Is that fair?

 4        A.   Yes, that's fair.

 5        Q.   Then she goes on to eliminate any

 6    other vehicles and says those are the only two

 7    vehicles that she would have operated as a

 8    vehicle.

 9                    Did you consider the number of

10    hours the plaintiff spent in the Humvee when

11    you were reaching your decision about causation

12    in this case?

13        A.   Well, I didn't specifically ask her

14    about the number of hours because that would be

15    difficult for her to recollect specifically,

16    but I did consider that.

17                    And, again, noise exposed in

18    either of these vehicles would be continuous

19    noise, not loud noise, and, again, if you can

20    talk to somebody sitting beside you in the

21    Humvee, then that would suggest that the noise

22    is not potentially dangerous.

23        Q.   You'd agree that when a vehicle like a

24    Humvee is operating that the number of -- that

25    the amount of noise it emits varies based on,

1    for example, the speed and the load and things

2    of that nature; correct?

3                MR. BAUER:  Objection, form.

4        A.   Well, I suppose that it would.  Again,

5    I think that most of the noise -- I would

6    assume it's much louder outside, closer to

7    where the engine is than it is internal, where

8    the Humvee is designed so that you can talk to

9    somebody sitting beside you, but I don't know

10   any details on the difference between the noise

11   levels in the Humvees.

12       Q.   Do you know whether the Humvee that

13   the plaintiff rode in had a weapons placement

14   or other openings in the outside of the

15   vehicle?

16       A.   No, I do not.

17       Q.   Do you know the number of trips the

18   plaintiff made in the Humvee?

19       A.   No, I do not.

20       Q.   Okay.  Do you know whether the

21   plaintiff wore hearing protection devices every

22   time that she rode in the Humvee?

23       A.   My understanding is that she did not.

24       Q.   And do you know which hearing

25   protection device she used when she rode in the

1  vehicle?

2      A.   No.  And my recollection is that was

3  unclear when I talked to her about those sorts

4  of things.

5      Q.   When you spoke to the plaintiff, did

6  you ask her to describe the Combat Arms

7  Earplugs?

8      A.   No, I don't think I did.

9      Q.   Are you aware that when she was asked

10  in deposition if she could recollect what those

11  Combat Arms Earplugs looked like, she was

12  unable to describe them?

13      A.   Yes, I do recall that in her

14  deposition.

15      Q.   Okay.  Would you consider the athletic

16  events that we've spoken about -- and I can ask

17  these questions individually.  I'll just do

18  that.

19              With respect to the plaintiff's

20  attendance at the NFL games, would you describe

21  the noise that she was exposed to at those NFL

22  games as potentially hazardous?

23              MR. BAUER:  Objection, form.

24      A.   Well, again, it would depend on the

25  intensity of the noise on her ears, and these

 1          MR. BAUER:  Thank you.

 2     Q.   Doctor Tyler, when did the plaintiff

 3   start using Combat Arms Earplugs during her

 4   service?

 5     A.   I don't recall.  I'd have to go back

 6   and look at the record.

 7     Q.   Would it be fair to say that it was

 8   prior to her deployment to Iraq in 2003?

 9     A.   I don't recall.  I'd have to go back

10   and look.

11     Q.   Okay.  Do you recall seeing an

12   audiogram from 2005 that reflected that she

13   reported using hand-formed earplugs at that

14   time?

15          MR. BAUER:  Objection, form.  If

16   you're going to ask about a document, please

17   show it.

18     A.   Yeah, can you show it to me, please?

19     Q.   I'll pull it up when we go to break

20   here.  I'll ask a couple more questions first,

21   though.

22          Are you offering an opinion

23   today that safer alternative earplug designs

24   were available which would have reduced or

25   eliminated the plaintiff's risk of

1    noise-induced tinnitus and hyperacusis in the

2    military?

3        A.    Absolutely.  I don't think that's in

4    question.

5        Q.    Is it your opinion that -- well, let

6    me take a step back.

7              What safer alternative designs

8    are you referring to?

9        A.    Well, there's a wide variety of other

10   hearing protection devices that were and are

11   currently available that have not been

12   acknowledged to have any deficits to them, so I

13   think there's several different devices that

14   she could have used.

15       Q.    Is it your opinion that because a

16   hearing protection device has not been

17   acknowledged to have a problem that it does not

18   have a problem?

19       A.    Well, I think that any manufacturer of

20   a hearing protection device would want to

21   monitor that very carefully, especially as an

22   example of what's happened in these 3M cases in

23   the last year, is that I'm sure that every

24   other company from now on in is going to be

25   very careful to make sure that there's no

1        Okay.  Doctor Tyler, this is the

2    list I was referring to in your report;

3    correct?

4        A.   Yes, I believe that's correct.

5        Q.   And there are a number of these

6    medications that have been found to have

7    ototoxic effects; is that correct?

8        A.   That's correct.

9             MR. BAUER:  Objection, form.

10       Q.   I'll just point to a couple of these

11   and ask you to tell me -- I'm going to ask you

12   a question about them.

13            Let's look at the first one on

14   the list.  Oxycodone acetaminophen, that's been

15   identified as a potentially ototoxic

16   medication; correct?

17       A.   Well, I don't have all of these

18   memorized, but I think that's true.

19       Q.   Are you aware of what dose is required

20   for oxycodone acetaminophen to have ototoxic

21   effects?

22            MR. BAUER:  Objection, form.

23       A.   Well, that would depend highly on the

24   individual.

25       Q.   Okay.  And, again, going down a little

1   bit further, you see where it says ibuprofen on

2   your list here?

3       A.   I do, yes.

4       Q.   And then also over on this other side

5   it says naproxen; correct?

6       A.   Yes.

7       Q.   Ibuprofen and naproxen are

8   nonsteroidal antiinflammatory drugs; correct?

9       A.   I'd have to check, but I believe

10  that's true.

11      Q.   Commonly referred to as NSAIDs;

12  correct?

13      A.   I believe that's true.

14      Q.   And NSAIDs have generally been -- have

15  been found to have ototoxic effects; correct?

16      A.   Well, several medications are listed

17  in part because the companies want to prevent

18  themselves from being sued.  If they have a

19  warning of a hearing loss and tinnitus and

20  hyperacusis, some of the companies do that,

21  although the likelihood of getting hearing

22  loss, tinnitus, and hyperacusis from most of

23  the medications is very low.

24      Q.   Okay.  Are you aware of any medical --

25  any sort of consensus in the medical community

1    frequencies and create a noise-induced notch.

2                    So we can see in this audiogram

3    there's a noise-induced notch at 6,000 hertz in

4    the left ear and looks like at 6,000 hertz in

5    the right ear, so that's consistent with a

6    noise exposure, not consistent with a hearing

7    loss due to medications.

8        Q.   Doctor, a general question.  Is it

9    possible to have a noise notch when you don't

10   have evidence that the hearing improves?

11                   So, for example, looking at

12   these 6,000 hertz levels, there's no 8,000 or

13   10,000 where we can see that notch kick back

14   up; is that correct?

15       A.   That's correct.

16                   MR. BAUER:  Objection, form.

17       A.   But we do -- you know, it doesn't

18   always -- it depends on the severity, and there

19   is also some more recent evidence that suggests

20   that the noise exposure can create high

21   frequency losses above 6,000 and above 8,000

22   hertz.

23       Q.   And just to clarify -- maybe this is a

24   question for Josh.  There is no hearing loss

25   claim here, correct, in this case?

1  correct?

2       A.   That's correct, yes.

3       Q.   And also when the plaintiff was not

4  using any hearing protection at all; correct?

5       A.   That's correct, yes.

6       Q.   You ruled out the ototoxic drugs that

7  we discussed; correct?

8       A.   Correct.  Again, I had to do 51 percent

9  causative.

10      Q.   Earlier I had asked you what the

11  percentage was that you had placed on this.

12  Your testimony is that it's more than 51 percent,

13  but you don't have a particular percentage?

14      A.   No.  It's hard to know precisely.

15      Q.   All right.  Did you consider as a

16  cause or contributing factor to tinnitus

17  arthralgia of bilateral TMJ?

18      A.   Temporomandibular joint disorder; is

19  that what you're referring to?

20      Q.   Yes, I am.

21      A.   So it's not clear in my mind that

22  temporomandibular joint disorder results in

23  sensorineural tinnitus.

24      Q.   How would you describe the plaintiff's

25  experience of tinnitus?  And what I mean by

1  that is the description that the plaintiff

2  gives to tinnitus.

3      A.   I'm not sure I understand your

4  question.

5      Q.   Well, some plaintiffs -- for example,

6  some people describe it as a ringing or buzzing

7  sound, something like that.

8              MR. BAUER:  Objection, form.

9  Can you just restate the question, please,

10  Counsel?

11              MR. OLSON:  Absolutely.

12      Q.   Do you recall how the plaintiff

13  describes her experience of tinnitus?

14      A.   No, I don't.  It must be in my report,

15  though.

16      Q.   Okay.  I am going to bring up again

17  the plaintiff's deposition, Exhibit 4.

18              So, Doctor, I'm going to again

19  show my screen here, and if you look here on

20  page 90, line 18 -- oh, sorry.  It hasn't gone

21  through yet.

22              Now can you see my screen?

23      A.   I can now, yes.

24      Q.   Perfect.  On page 90, line 18 here,

25  the question starts, "Are you experiencing

1    always work and sometimes they get in the way.

2    That doesn't surprise me.

3        Q.    Did you consider the plaintiff's sleep

4    apnea as a potential cause or contributing

5    factor for her tinnitus?

6              MR. BAUER:  Objection, form.

7        A.    Sleep apnea does not cause tinnitus.

8    Tinnitus can cause sleep difficulties, and

9    certainly if she has some other disorder in

10   addition to her tinnitus, that's going to make

11   it more difficult for her to deal with things

12   like sleep apnea caused by some other reason.

13       Q.    Does the plaintiff complain in this

14   case that her tinnitus prevents her from

15   falling asleep?

16       A.    I'd have to go back and look at my

17   records on that.

18       Q.    Let me pull that up for you here.

19   Going back to the deposition, and if you go

20   down on page 101 here, it says, "Has it, the

21   tinnitus ever prevented you from falling

22   asleep?"  Answer, "No."

23       A.    Okay.  Yeah, okay.  Well, that's

24   consistent with her notion that it's

25   intermittent.

1      Q.   Okay.  And then the plaintiff was also

2  involved in a car accident, I believe, in

3  around 2017.  Do you recall that?

4      A.   I do, yes.

5      Q.   Are you aware of whether the air bag

6  went off in that collision?

7      A.   I forget at this point.

8      Q.   If an air bag were to deploy in a car,

9  could that cause hearing damage, including

10  tinnitus?

11           MR. BAUER:  Objection, form.

12      A.   Yes, it can, if it creates an

13  impulsive noise.

14      Q.   Let's turn for a minute to

15  hyperacusis.  What's your definition of

16  hyperacusis?

17      A.   Well, I've written a review article on

18  this many years ago and so, generally speaking,

19  I can just say that hyperacusis is when

20  moderately intense sounds are very, very loud,

21  perceived as very loud.

22      Q.   And is that definition generally

23  accepted within the medical community?

24      A.   I think it is in the audiological

25  community, yes.

1      Q.   Okay.  What is the relationship

2   between hyperacusis and noise exposure?

3      A.   Well, certainly noise exposure can

4   cause hyperacusis.  It's not as straightforward

5   as tinnitus is.  Again, the most common cause

6   of tinnitus is noise exposure, but the surveys

7   and data are not as clear.  There's many

8   unknown causes of hyperacusis.

9      Q.   Has the plaintiff ever been diagnosed

10   with hyperacusis by one of her treating

11   physicians or audiologists?

12      A.   I don't think that's the case.  A lot

13   of people in health care don't really know very

14   much about hyperacusis at all.

15      Q.   Okay.  So in this case have you

16   diagnosed the plaintiff with hyperacusis?

17            MR. BAUER:  Objection, form.

18      A.   Well, from the context of my

19   discussions remotely and looking at her records

20   and knowing that, you know, she was exposed to

21   intense noise, I guess that it's my opinion

22   that she has hyperacusis.

23            It's not as straightforward as

24   it would be for a patient I saw, you know, over

25   time, went through things in more detail, but

1    the reports that I heard from her --

2         Q.   And --

3         A.   -- were consistent with hyperacusis.

4         Q.   I apologize.  I didn't mean to

5    interrupt you there.

6                   What type of hyperacusis have

7    you diagnosed the plaintiff with, cochlear or

8    vestibular?

9                   MR. BAUER:  Objection, form.

10        A.   So the different types of hyperacusis

11   that I've suggested with my colleagues in this

12   literature have to do primarily, I guess, with

13   loudness, annoyance, fear, and pain

14   hyperacusis.

15                  And I didn't go into any great

16   detail with her hyperacusis, but I could say

17   that my perspective is that she has loudness

18   hyperacusis.

19        Q.   Are you aware of whether there is an

20   ICD-10 code for hyperacusis?

21        A.   I am not aware, actually.

22        Q.   Okay.  Are you aware of whether

23   hyperacusis is associated with migraines?

24        A.   Well, I'm sure it can be.  As I said,

25   it can be caused by many different things.

1    It's a lot more complicated than tinnitus is,

2    so I'm sure if you have some head injury, for

3    example, that that might cause migraines and

4    hyperacusis.

5        Q.   Okay.  And have you eliminated

6    migraines as a cause of the plaintiff's

7    hyperacusis?

8        A.   Well, again, I don't think migraines

9    cause hyperacusis, migraines don't cause

10   tinnitus.  I think that you might have some

11   trauma in your life and that could be, as I

12   said, a head injury that might cause migraines

13   and also cause hyperacusis at the same time.

14       Q.   Okay.  And is there an association

15   between hyperacusis and TMJ dysfunction?

16       A.   Not clear that I can say that's the

17   case.  As I said, we talked about this for

18   tinnitus, that there's a lot of patients that

19   can modify their tinnitus by moving their jaw

20   around.

21                I think that, you know,

22   hyperacusis is a lot more complicated and

23   people have a lot more diverse complaints and

24   interactions with other things.  I guess it

25   wouldn't surprise me if somebody -- if there

1    hyperacusis?

2        A.    Well, maybe I should have been clearer

3    that, you know, I think those other conditions

4    you just mentioned, as we've discussed, do not

5    cause tinnitus or hyperacusis, but it certainly

6    is true that if she had those before she had

7    her tinnitus and hyperacusis, then getting

8    tinnitus and hyperacusis would make it more

9    problematic for her to deal with her tinnitus

10   and hyperacusis if she was already stressed out

11   or had trouble sleeping because of those other

12   conditions.

13       Q.    Okay.  And, Doctor Tyler, up above in

14   this paragraph here, it states that you

15   considered a variety of potential causes and

16   some of those you go into below at additional

17   length; correct?

18       A.    Correct.

19       Q.    One of the ones that you didn't go

20   into at additional length includes hearing

21   protection device use.

22              And given that we've discussed

23   today that -- and I don't want to -- so please

24   correct me.  I don't want to mischaracterize

25   your testimony, so correct me if I do -- that

1  we don't know the amount of time that the

2  plaintiff used the CAEv2 ear protection, we

3  don't know what situations she may not have

4  worn it, there's a number of situations at

5  least where we know she didn't wear it, and

6  then there are other unknown hearing protection

7  devices that were used, is that a -- before I

8  ask the question, is that a fair summary of the

9  testimony?

10     A.   That certainly is a complicating

11  factor in this case, in this particular case,

12  yes.

13     Q.   So given all of that, is it still your

14  opinion that the tinnitus and hyperacusis are

15  to a reasonable degree of medical certainty the

16  cause of Ms. Roper's tinnitus and hyperacusis

17  even given all that uncertainty regarding the

18  use of hearing protection?

19     A.   Well, there's certainly some

20  uncertainty here, but as my understanding is, I

21  was only asked to judge 51 percent of the time.

22              And, as I said, although she

23  was exposed to the amount of noise and when she

24  was using earplugs in general was unclear in

25  this case, the other earplugs when she was

1  using them certainly has not been shown to be

2  defective and I think that, you know, just

3  generally speaking for all of us when there is

4  some clear upcoming event that we know we're

5  going to be potentially exposed to loud noise

6  that we would be wearing hearing protection.

7                  And if she was wearing the

8  3M earplugs in general, that could be real

9  trouble.  If she was wearing some other

10 earplugs when that happened, that would not be

11 so dangerous.

12     Q.   Can you state with certainty that when

13 Ms. Roper knew that there was an upcoming event

14 where she would be exposed to loud noise that

15 she did in all circumstances wear hearing

16 protection?

17     A.   No.  I'm pretty sure she did not in

18 all circumstances, but I tried to make a

19 general comment.

20                  MR. OLSON:  I will pass the

21 witness over to you, Josh.

22                  MR. BAUER:  I have a few

23 questions.  Can you stop sharing your screen,

24 please?

25                  MR. OLSON:  I absolutely can.

1              C E R T I F I C A T E

2

3        I, the undersigned, shorthand reporter,
a Notary Public, do hereby certify that I acted

4  as the shorthand reporter in the foregoing matter
at the time and place indicated herein; that I

5  took in shorthand the  proceedings had at said
time and place; that said shorthand notes were

6  reduced to print under my supervision and
direction by means of computer-aided transcription,

7  and that the foregoing pages are a full and
correct transcript of the shorthand notes so

8  taken; that said deposition was submitted to
the witness for signature, if requested to do

9  so by a party or the witness; that any changes
if any, requested by the witness are attached

10  hereto.

11

12        I further certify that I am neither
attorney nor counsel for, or related to or

13  employed by any of the parties in the foregoing
matter, and further that I am not a relative or

14  employee of any attorney or counsel employed by
the parties hereto, or financially interested

15  in the action.

16

17

18

19                  NOTARY PUBLIC

20

21

22

23

24

25