# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-2885 |
| | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |
| This Document Relates to: *Roper v. 3M Company* Case No. 7:20-cv-02945 | |

## PLAINTIFF'S MOTION TO EXCLUDE CERTAIN EXPERT OPINIONS AND MEMORANDUM IN SUPPORT

Plaintiff Shanika Roper submits this motion and memorandum of law moving the Court for an order excluding Defendants' expert Dr. Alan Pollak from providing any opinion that:

1. the CAEv2 is not defective;

2. the CAEv2 did not contribute to Plaintiff's hearing damage;

3. Plaintiff's tinnitus is non-existent due to a lack of noise induced hearing loss; and

4. does not comport with its Ototoxicity Science Day Order.

As detailed below, these opinions fail to meet the requirements for admissible expert testimony under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and Federal Rules of Evidence 702, 703, and 403.

# I.    <u>Legal Standard</u>

Expert testimony is reliable and relevant when it satisfies the criteria of "qualification, reliability, and helpfulness." *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1286 (N.D. Fla. 2017) (Rodgers, J.). To meet these standards, the offering party must show that "(1) the expert is sufficiently qualified to testify about the matters he intends to address; (2) the methodology used is 'sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence, or to determine a fact in issue.'" *Id.* Ultimately, a court's gatekeeping "role is to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311-12 (11th Cir. 1999).

# II.    <u>Argument</u>

## 1.    <u>Any opinion by Dr. Pollak that the CAEv2 is not defective should be excluded.</u>

Any opinion by Dr. Pollak that the CAEv2 is not defective (or is safe and effective) should be excluded because (1) no such opinion was

included in his expert report and (2) Dr. Pollak never reviewed any information or documents about the CAEv2's design, testing, efficacy, marketing, or sale in connection with his work in this case. Ex. 1 (Expert Report); Ex. 2 (Pollak Dep. at 104:11-14) (stating it is safe to say he has not reviewed any expert reports regarding the efficacy of the Combat Arms earplugs). Federal Rule of Civil Procedure 26(a)(2)(B)(i) requires that an expert's written report contain "a complete statement of all opinions the witness will express and the basis and reasons for them." By failing to include an opinion that the CAEv2 is not defective (or is safe and effective) in his report, there is no way for Plaintiff or the Court to evaluate the reliability of such opinion and any opinion by Dr. Pollak concerning same would be mere *ipse dixit*. Dkt. 2218 at 41-42. Moreover, this Court has consistently held that an expert that has not reviewed "any information about the CAEv2's design, testing, efficacy, marketing, or sale," "may not offer opinions in those areas or otherwise base his causation opinions on them." Dkt. 2845 at 21, 27-28; Dkt. 142 (*Beal*) at 11-12; *see also* Dkt. 2218 at 41-42. Under applicable law and this Court's precedent, any opinion by Dr. Pollak that the CAEv2 is not defective should be excluded.

**2.** **The Court should exclude any opinion by Dr. Pollak that the CAEv2 did not contribute to Plaintiff's Hearing Damage.**

Dr. Pollak has no basis for any opinion that the CAEv2 did not contribute to Plaintiff's hearing damage. According to the materials considered list in his Expert Report, Dr. Pollak did not review any information about the CAEv2's design, testing, efficacy, marketing, or sale in connection with his work in this case. *See* Ex. 1, ex. A (Expert Report – Materials Considered List); Ex. 2 (Pollak Dep. at 104:11-14). Accordingly, Dr. Pollak has no reliable and helpful opinion on those subjects, which precludes him from basing any causation opinions on those topics. *See* MDL Dkt. 2218 at 41-42; MDL Dkt. 2845 at 21.

**3.** **Dr. Pollak should be prohibited from giving any opinion as to Plaintiff's tinnitus being non-existent due to a lack of noise induced hearing loss.**

Dr. Pollak opines that absent noise-induced hearing loss, Plaintiff most likely would not have tinnitus, which is an unreliable logical leap. *See* Ex. 1 (Expert Report) at 16; Ex. 2 (Pollak Deposition Excerpt) at 85:3-13. In reality, it is well-accepted (and has been repeatedly conceded by Defendants and defense experts) that individuals without sensorineural hearing loss as measured by traditional pure tone audiometry can nonetheless suffer from tinnitus. *See* MDL Dkt. 1910 at 16. Accordingly,

"the absence of sensorineural hearing loss of that nature cannot, alone, constitute a scientifically reasoned explanation for rejecting noise exposure as a cause of an individual's tinnitus." *Id.* Dr. Pollak should be excluded from giving any testimony to the contrary.

4. **The Court should exclude any opinion that does not comport with its Ototoxicity Science Day Order.**

Dr. Pollak opined during his deposition and in his expert report that a variety of allegedly ototoxic substances and medications could cause or contribute to Plaintiff's hearing loss and/or tinnitus. *See* Ex. 1 at 18. However, this Court previously limited the scope of ototoxic substances and medications that are relevant to the claims at issue in this litigation to:

- Aminoglycosides and platinum-based antineoplastics, including alkylating in cases where Plaintiffs allege they suffer from either or both hearing loss and tinnitus; and
- Naproxen and Vicodin where Plaintiffs allege permanent hearing loss.

MDL Dkt. 1330. The Court determined that over 40 other allegedly ototoxic substances and medications were not relevant. *Id.* at Ex. A.

Plaintiff's only claim in this lawsuit is for tinnitus. *See* Dkt. 4. The Court should therefore exclude Dr. Pollak from giving any opinion regarding any allegedly ototoxic substances or medications (other than

opinions relating to aminoglycosides and platinum-based antineoplastics) based on its prior order and on reliability, helpfulness, and 403 grounds.

### III.   CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff's motion and exclude Dr. Pollak from providing any opinion that (1) the CAEv2 is not defective; (2) the CAEv2 did not contribute to Plaintiff's hearing damage; (3) Plaintiff's tinnitus is non-existent due to a lack of noise induced hearing loss; and (4) does not comport with its Ototoxicity Science Day Order.

DATED: July 21, 2022        **Respectfully submitted,**

By: */s/ Joshua H. Bauer*                              

**REICH & BINSTOCK LLP**
Dennis C. Reich
Texas State Bar No. 16739600
Joshua H. Bauer
Texas State Bar No. 24084380
4265 San Felipe, Suite 1000
Houston, Texas 77027
Tel: (713) 622-7271
Fax: (713) 623-8724
dreich@reichandbinstock.com
jbauer@reichandbinstock.com

*Attorney for Plaintiff*

## CERTIFICATE OF COMPLIANCE
## WITH LOCAL RULES 7.1(F)

I hereby certify that this motion complies with the word limit of Local Rules 7.1(F) and contains 1,119 words.

*/s/ Joshua H. Bauer*                        

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2022, I caused a copy of the foregoing to be served on all counsel of record via MDL-Centrality.

*/s/ Joshua H. Bauer*                        

# EXHIBIT 1

| | | |
|---|---|---|
| IN RE: 3M COMBAT ARMS | ) | Case No. 3:19-md-2885 |
| EARPLUG PRODUCTS LIABILITY | ) | |
| LITIGATION | ) | Judge M. Casey Rodgers |
| | ) | Magistrate Gary R. Jones |
| | ) | |
| This Document Relates to: | ) | |
| Shanika Roper | ) | |
| Civil Case No. 7:20-cv-02945-MCR-GRJ | ) | |

## DEFENDANTS' RULE 26 EXPERT WITNESS DISCLOSURES

Pursuant to CMOs No. 31 and 36, and Rule 26 of the Federal Rules of Civil Procedure, Defendants hereby submit the following expert disclosures, identifying individuals who may be called upon to provide expert testimony in the above-captioned case.

## GENERAL RETAINED EXPERT WITNESSES

Pursuant to CMOs No. 31 and 36, Defendants have served or will serve general expert reports by the following individuals using the MDL Centrality Portal:

| EXPERT NAME | AREAS OF EXPERTISE |
|---|---|
| Gregory Flamme, Ph.D. | Noise Exposure |
| Mark Stephenson, Ph.D. | Noise Exposure |
| Stephen Tasko, Ph.D. | Noise Exposure |
| William Murphy, Ph.D. | Noise Exposure |
| Dennis Driscoll, P.E. | Noise Exposure |
| John Casali, Ph.D. *(adoption of prior report)* | CAEv2 Performance, Testing, and Safety |
| Jennifer LaBorde, Au.D. | Audiology |
| James Crawford, M.D. | Otolaryngology |

| EXPERT NAME | AREAS OF EXPERTISE |
|---|---|
| Karthik Rajasekaran, M.D. | Otolaryngology |
| Harri Kytomaa, Ph.D. *(adoption of prior opinions)* | Engineering |
| Scott Elledge, M.D. | Military Hearing Conservation Programs |
| John Bertleson, Jr., M.D. | Neurology |
| Stan Phillips, M.D. | Tinnitus |
| M. Charles Liberman, Ph.D. | Hearing Loss |
| Winn Chatham, M.D. | Autoimmune Hearing Loss |
| Kenneth Billheimer, Au.D. | CAEv2 Testing |
| Jennifer Tufts, Ph.D. | CAEv2 Testing |
| Richard Neitzel, Ph.D. | CAEv2 Testing |

## CASE SPECIFIC EXPERT WITNESSES

| EXPERT NAME | AREAS OF EXPERTISE | DEPOSITION AVAILABILITY |
|---|---|---|
| Alan C. Pollak, MD | ENT/Otolaryngologist | 06/16/2022 @ 9 a.m. CT<br>06/17/2022 @ 9 a.m. CT |

Any additional general expert reports that are disclosed by Defendants in Wave 1 are also incorporated here by reference. Discovery remains ongoing, and Defendants reserve the right to amend and/or supplement this disclosure.

Dated:  May 10, 2022                    Respectfully submitted,

/s/ Randall L. Christian
Randall L. Christian (*pro hac vice*)
TX Bar No. 00783826
Mary R. Pawelek (*pro hac vice*)
TX Bar No. 00788170
Patrick L. DeLaune (*pro hac vice*)
TX Bar No. 00793606
BOWMAN AND BROOKE LLP
2901 Via Fortuna Drive, Suite 500
Austin, TX 78746
Telephone:  (512) 874-3811
Facsimile:      (512) 874-3801
Randall.Christian@bowmanandbrooke.com
Mary.Pawelek@bowmanandbrooke.com
Patrick.DeLaune@bowmanandbrooke.com

*Counsel for Defendants 3M Company,*
*3M Occupational Safety LLC, Aearo*
*Technologies LLC, Aearo Holding,*
*LLC, Aearo Intermediate, LLC and Aearo, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2022, pursuant CMOs No. 31 and 36, I electronically served the foregoing document on Plaintiff using the MDL Centrality Portal.

/s/ Tammy L. Yonker
Tammy L. Yonker

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION


| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-02885 |
| Document Relates to: Shanika Roper | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |
| Civil Action No. 7:20-cv-02945-MCR-GRJ | |


### EXPERT REPORT OF ALAN POLLAK, M.D.



**"CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER"**

## I.    BACKGROUND

### A.  Introduction

Counsel for 3M has requested that I review the history and medical records of Shanika Roper to evaluate her hearing loss and tinnitus claims. I was further retained to review and evaluate the opinions submitted by Ms. Roper's expert witnesses including the report of Richard Tyler, Ph.D. The opinions I offer in this report are all held to a reasonable degree of medical and scientific certainty. In reaching my opinions I reviewed the materials cited in my Report and listed in Exhibit A, Materials Considered. Further, I relied upon my education, and over thirty years of professional clinical experience as an Otolaryngologist/Head and Neck surgeon, and my clinical judgment in reaching my opinions.

### B.  Professional Background and Experience

I graduated Phi Beta Kappa with a Bachelor of Arts from Northwestern University in 1983. I next completed a year-long clinical fellowship in Anatomic Pathology at Lutheran General Hospital in Park Ridge, Illinois, and then attended medical school at Rush Medical College in Chicago where I earned my medical degree in 1988. Following an internship in General Surgery at Northwestern University, McGaw Medical Center, I completed a four year residency at the same institution in General Surgery and Otolaryngology / Head and Neck Surgery. I am Board Certified by the American Board of Otolaryngology / Head and Neck Surgery.

Over the past thirty years of clinical practice, I have served in many administrative capacities at multiple healthcare institutions. Since 2012, I have served as the Section Chief of Otolaryngology / Head and Neck Surgery at Mount Sinai Hospital in Chicago. I am currently the Chairman of the Department of Surgery at Mount Sinai Hospital. In this role, I am personally responsible for managing nine surgical divisions within this department for the past five years.

During my ten-year period at Mount Sinai Hospital, I have also served as President of the Sinai Medical Group and Secretary of the medical staff. Since 2017, I have been a Clinical Assistant Professor of Surgery at the University of Illinois at Chicago.

My thirty years of practice in Otolaryngology / Head and Neck Surgery has been a full-time, patient oriented, clinical practice despite my administrative and teaching responsibilities. A significant component of my patient care responsibilities includes the diagnosis and treatment of otologic and hearing disorders. I have extensive experience in evaluating patient complaints of hearing loss, tinnitus, and hyperacusis arising from various etiologies. As an otolaryngologist, I have participated in rendering therapeutic treatment modalities for these conditions and have educated my patients in hearing conservation measures. My curriculum vitae is attached as Exhibit B.

For this matter, I am being compensated at $250 an hour for consulting, records review, meetings, and drafting my report; $550 an hour for depositions; and $1,500 an hour

for trial testimony.  In the past four years, I have provided expert deposition testimony in the following cases:  *C. Slama v. John Rachel, M.D. et al.,* Case No. 2017-L-001305, Circuit Court, Cook County, Illinois; *K. Koryczan v. Patel,* Case No. 45D01-2003-CT-00351, Lake Superior Court, Civil Division 7, State of Indiana .  I have not testified in any trial proceeding in the last four years.

### C.  Summary of Case-Specific Opinions

- Surveillance Audiometric testing from April 2005 to April 8, 2017 to March 15, 2022 inclusive of seven exams does not demonstrate any auditory deficits. This time period includes the time Plaintiff reportedly used the Combat Arms Earplugs Version 2 ("CAEv2") hearing protection.

- No temporary or permanent auditory threshold shifts are demonstrated from April 2005 to April 8, 2017 to March 15, 2022. This time period includes the time Plaintiff reportedly used the Combat Arms Earplugs version 2.

- Ms. Roper's use of the CAEv2 did not cause or contribute to any degree of hearing loss.

- To the extent Ms. Roper claims audiometric threshold shifts and/or hearing damage as a result of her noise exposure during her military service, there are factors unrelated to her use of the CAEv2 which could cause and/or contribute to that claimed hearing damage.

- The classification of hyperacusis described by Plaintiff's expert does not rise to the level of the subtype known as recruitment.  Plaintiff's experience is consistent with alternate etiologies for this phenomenon and is not related to noise exposure while in the military.

- Ms. Roper's use of the CAEv2 did not cause or contribute to her complaints of tinnitus.

- Ms. Roper's medical and military history reflects factors unrelated to her use of the CAEv2 which could cause and/or contribute to her complaints of tinnitus.

- There are medical treatments and interventions which can help with symptoms of hearing loss and tinnitus.

## II.    GENERAL BACKGROUND ON HEARING LOSS[1]

### A.  Hearing Loss

Hearing loss can be caused by a wide variety of factors. Patients may present with the complaint of being unable to hear, or they may complain of difficulty understanding. Often, a family member brings the patient for a hearing test because of communication difficulties. Older individuals often complain of tinnitus, which may be described as a sound like ringing, buzzing, or "crickets" in the ears. While tinnitus is usually a manifestation of hearing loss, it may have other causes as well. Hearing loss in children may be particularly difficult to detect, and is often confused with inattention or speech delay.

Depending on the specific type and etiology of the hearing loss, dramatically different treatments may be prescribed. It is important to determine whether the problem is with the conductive pathway of the ear (conductive) or with the inner ear or eighth cranial nerve (sensorineural). Conductive hearing loss can be due to cerumen impaction, swelling of the external auditory canal, tympanic membrane perforations, middle ear fluid, or ossicular chain abnormalities. Sensorineural hearing loss can occur as a result of injury to the hair cells in the cochlea or neural elements innervating the hair cells. The most common etiologic factors are persistent noise exposure, age-related changes of the eighth cranial nerve (presbycusis), genetic factors, and infectious or post-inflammatory processes. Tumor growth (acoustic neuroma) along the course of the eighth cranial nerve can also be the etiology of sensorineural loss and must be included in the differential diagnosis.

Pure-tone audiometry ("the hearing test") is frequently used to assess the patient's hearing levels. The test requires that the patient is able and willing to cooperate. It can be especially difficult in the case of very young children. Hearing threshold levels are determined between 250 and 8000 Hertz (Hz) for pure tones and measured in decibels (dB). The 0-dB level is "normalized" to young, healthy adults and doesn't mean there is absence of detectable sound. Some patients hear 0 dB, but reaching the threshold of hearing usually requires louder test signals. The higher the threshold is, the poorer the patient's hearing. Thresholds higher than 25 dB are considered abnormal.

During the audiogram, independent thresholds are determined for each ear for both air conduction (conductive hearing) and bone conduction (sensorineural hearing). Air conduction measures the ability of the external and middle ear to transmit sound to the cochlea. Conductive hearing loss can result from any barrier that could block sound transmission in this pathway (cerumen, perforation, middle ear fluid). This will create an air-bone gap between the air and bone conduction thresholds on the audiogram. Sensorineural hearing loss can be diagnosed if the air conduction and bone conduction thresholds are equal but higher than 25 dB.

---

[1] This information is taken primarily from the American Academy of Otolaryngology – Head and Neck Surgery Foundation textbook on Primary Care Otolaryngology which I find to be accurate and reliable.  I have also added additional background information based on my education, training, and clinical experience.



**Figure 6.1.** A conductive hearing loss in the left ear due to otitis media with effusion. Note that bone conduction thresholds are normal in both ears, but air conduction on the left is 30 dB poorer than that measured on the right. Remember that zero (0) dB does not refer to absence of sound, but rather represents an average threshold for young, healthy adults.

Our ability to hear is more complex than just listening to single pure tones in a sound-proof booth. Therefore, a test of the patient's ability to understand spoken words should be performed as well. In a speech discrimination test, the patient is presented with phonetically balanced words (i.e., love, boat, pool, sell, raise) that are amplified to a comfortable hearing level as necessary. The results of this test, the speech discrimination score, should be between 90 percent and 100 percent for "normal" speech discrimination. This test of clarity also assesses the function of the auditory division of the eighth cranial nerve. The ability to understand speech is very important, especially with respect to determining to what degree a hearing aid will help a particular patient. Amplifying garbled speech (with a hearing aid) has limited benefit for patients with very poor speech discrimination.

Tympanometry is commonly used to evaluate the tympanic membrane (TM) and middle ear status. This test assesses the mobility of the TM and its response to pressure changes in the external auditory canal. Three common patterns are shown in Figure 6.2.



**Figure 6.2.** Three tympanograms demonstrating change in compliance of the middle ear (vertical axis) with changes in ear canal pressure. Type A is normal, with the greatest compliance at the point where the pressure in the ear canal is equal to that of atmospheric pressure (peak is at 0). Type B demonstrates very poor compliance at any frequency, suggestive of a tympanic membrane (TM) immobilized by fluid in the middle ear or a TM perforation (no peak). Type C represents a tympanogram in which the compliance of the membrane is greatest at a point where the pressure in the canal is 200 mm of water below that of atmospheric pressure (peak shifted to the left). This suggests inefficient eustachian tube function with persistent negative pressure in the middle ear.

Type A plots arise when the external auditory canal is patent and the middle ear and TM are healthy (maximum TM mobility when pressure in the canal is atmospheric). Type B plots occur when the middle ear is filled with fluid or the TM has a perforation (no peak in eardrum mobility). The two problems can be differentiated by examining the volume read by the impedance bridge. Middle ear fluid will generate normal volumes, while tympanic membrane perforations will generate large volumes. Type C plots (peak eardrum mobility when pressure is sub-atmospheric) are typical of patients with retracted TMs secondary to

6

eustachian tube dysfunction. Tympanometry results can help detect middle ear fluid when the physical exam is unclear.

### B.  Conductive Hearing Loss

Careful physical examination of the ear with the aid of a microscope, tuning fork testing, and audiometric testing can frequently determine the cause of a conductive hearing loss. Most causes of conductive hearing loss can be medically or surgically corrected—they can be improved or resolved with treatment and without use of a hearing aid. Swelling of the external auditory canal secondary to otitis externa can be treated with appropriate topical medication. Cerumen impaction can be cleaned with irrigations, ear drops, or specialized instruments. Middle ear fluid, the most common cause of hearing loss in children, can be treated with antibiotic therapy or myringotomy tubes, and tympanic membrane perforations can be surgically repaired. Cholesteatoma often presents with hearing loss, and in the physical examination, it can be confused with cerumen.

Conductive hearing loss present on the audiogram but not readily apparent on the physical exam suggests problems with the ossicular chain. One common disease process affecting the ossicular chain is otosclerosis, a hereditary disease process that involves bony proliferation within the temporal bone. These bony changes commonly occur at the footplate region of the stapes, causing gradual fixation of the ossicular chain. This fixation, in turn, decreases the mobility of the stapes footplate and creates a conductive hearing loss. Surgical correction— stapedotomy—is available. A stapedotomy procedure re-establishes ossicular continuity by removing the fixed stapes ossicle and placing a prosthesis between the incus and the vestibule of the inner ear. Sound vibrations can then be transmitted from the ossicular chain, through the prostheses and into the inner ear, restoring the patient's hearing.

### C.  Sensorineural Hearing Loss

Sensorineural hearing loss (SNHL) is the most common form of hearing loss. It is generally not treatable with surgery, although cochlear implants and other implantable audiologic devices may be helpful in cases of profound sensorineural or mixed hearing loss. There are many causes of this type of hearing loss, but age-related changes to the cochlea causing presbycusis are by far the most frequent cause. As we age, the outer hair cells within the cochlea gradually deteriorate, causing a symmetrical SNHL that begins in the high frequencies (Figure 6.2). Patients with presbycusis may also complain of tinnitus and have difficulty with speech discrimination.

Another common type of hearing loss is secondary to acoustic trauma or "noise exposure." Noise exposure is common in certain industries and is closely regulated by a federal government agency, the Occupational Health and Safety Administration. Recreational target shooting, hunting with firearms, use of personal stereos or iPods® or other MP3 devices with headphones, loud music exposure, power tools, etc., can cause a specific type of hearing loss with a characteristic audiometric pattern.

Prevention is vital, and counseling should be part of routine health maintenance. Treatment consists of hearing education, noise avoidance when possible, and appropriate hearing protection with ear plugs or earmuffs when loud noise is present. Patients should also have regularly scheduled audiometric follow-up.

Sudden sensorineural hearing loss is an acute loss of hearing that represents an ENT emergency and deserves special management.

Patients with asymmetric SNHL require a more thorough evaluation to rule out a benign tumor of the eighth cranial nerve, known as an acoustic neuroma. Although most patients with an asymmetric hearing loss do not have an acoustic neuroma, hearing loss is by far the most common presenting complaint in patients with such tumors. In addition, these patients will frequently have very poor speech discrimination scores and tinnitus in the affected ear. They may also occasionally have disequilibrium complaints, although true vertigo is rare. Specialized audiometric testing can be done to assist in the diagnosis of acoustic neuromas, but magnetic resonance imaging (MRI) with gadolinium is the diagnostic test of choice. Physical exam and testing may elucidate an easily treatable cause of hearing loss. However, more serious causes can be present that require careful assessment and complex management. To ensure that diagnoses of serious conditions such as cholesteatoma or acoustic neuroma are made, patients with hearing loss should be referred to an otolaryngologist for evaluation and management of their care. For this reason, many states require an evaluation by a physician before a hearing aid can be fitted.

**D. Tinnitus**

Tinnitus is a symptom characterized by the perception of sound in the absence of an external stimulus. Jay M. Bhatt, MD et al., Otolaryngology Head and Neck Surgery, JAMA, 2016 Oct 1, 142 (10). Tinnitus is a common problem for millions of people, as epidemiologic studies have reported its prevalence to between 8 and 25.3% of the population of the United States. Bhatt 2016. Durations of occupational and leisure time noise exposures correlated with rates of tinnitus and are likely targetable risk factors. Bhatt 2016.

Furthermore, there is an elevated risk of tinnitus in people with a history of head injury, depressive symptoms, target shooting, arthritis, use of non-steroidal anti-inflammatory drugs (NSAIDs) medications, hypertension, and smoking. Bhatt 2016.

**E. AAO-HNSF – Treatment options for tinnitus**

Treatment options for tinnitus include:

1. Medications
2. Hearing Aids
3. Nutritional Supplementation
4. Stress Reduction Methods
5. Music Treatment
6. Tinnitus Retraining Therapy

7. Biofeedback Therapy
8. Wearable Masking Device
9. Cognitive Behavioral Therapy

"The majority of respondents in our survey noted symptoms for over 12 months. However, independent of symptom duration, most of the respondents with tinnitus believed their symptoms to be "not a problem" or "only a small problem." Similarly, 55.5% of respondents in the Blue Mountains Hearing Study reported their symptoms to be "mild." Bhatt 2016. Thus, it is evident that for many patients with chronic tinnitus, the severity of symptoms may actually be tolerable and do not require treatment.

**F. Standard Threshold Shifts**

1. OSHA STS Twice: in either ear, a change of 10 dB or more in the averaging of hearing thresholds at 2000, 3000, and 4000 Hz is present on one annual audiogram and is persistent in the same ear on the next audiogram. There are current recommendations to increase the threshold change to 15 dB or more at any frequency (500, 1000, 2000, 3000, 4000, or 6000 Hz) in either ear that is confirmed for the same ear and frequency by a second test within 30 days of the first test. This recommendation has been made by National Institute of Occupational Safety and Health (NIOSH).

2. American Academy of Otolaryngology – Head and Neck Surgery (AAO-HNS) Shift: in either ear, a change of 10 dB or more in the average of hearing thresholds at 500, 1000, and 2000 Hz, or 15 dB or more at 3000, 4000, and 6000 Hz.

**G. Hyperacusis**

Hyperacusis has been defined as "unusual tolerance to ordinary environmental sounds" and more pejoratively as "consistently exaggerated or inappropriate responses to sounds that are neither threatening nor uncomfortably loud to a typical person."

**H. Noise Induced Hearing Loss**

Noise induced hearing loss can be caused by an acute exposure to an intense impulse of sound or by a continuous steady-state long term exposure with sound pressure levels higher than 75-85 dB.

Many weapons emit sounds that exceed the maximum achievable protection that double hearing protection can offer. Double hearing protection means both earmuffs and ear plugs are used.

The Army requires personnel to wear hearing protection when exposed to impulse noise levels between 140 and 165 dBP. The Army also requires hearing protection for steady state noise levels between 85 dBA and 103 dBA. At impulse noise levels above 165 dBP, and

steady state noise levels above 103 dBA, the Army requires the use of double hearing protection.

## I.   Ear Blast Injuries

I agree with Mizutan et al when they write "The incidence of blast injuries has increased recently, due to the increased use of improvised explosive devices (IEDs) by terrorists in civilian situations, and the increased use of explosives by military forces, such as in the wars in Afghanistan and Iraq.  The most critical and pathognomonic injury is a primary blast injury.  This is caused by barotrauma, which consists of over-pressurization or under-pressurization relative to atmospheric pressure.  A blast pressure wave exerts forces mainly at air-tissue interfaces within the body, and therefore the auditory system is at high risk, "i.e., the cochlear and central auditory pathways, comprise the part of the body most commonly damaged by blast overpressure."

"The most common outcome of blast exposure is sensorineural hearing loss (SNHL), which has a high incidence rate in blast injured patients."

## III.   PLAINTIFF'S HISTORY

### A.  Military History

Ms. Roper was born August 17, 1982.  She enlisted in the Army in August 2001 and ended her service on October 3, 2018.  Over this 17-year period she largely served as an office administrator and clerk.  Depo p 38.  She attended basic training at Fort Jackson, South Carolina.  Depo p. 42.  She served at a base in Rome, Georgia from 2001-2004. Depo p. 36. She recalls being at Fort Riley, Kansas from 2005 to 2009, and then from 2009 to 2012 at Fort Hood, Texas.  Depo p. 37.  From 2012 to 2014 she was at Fort Benning, after which she served at the Redstone Arsenal Unit until 2018.  Depo p. 37.  She served a twelve month tour overseas from 2003 to 2004 in Baghdad, Iraq, where she worked as a postal clerk in the mail sorting and distribution facility. 3M_ROPER_S000540; depo p. 35. She has continued serving as a civilian clerk with the Department of Veterans Affairs in Atlanta, Georgia.  Her right hand is her trigger-firing hand. Depo p. 20.

### B.  Noise Exposure History

**Use of Hearing Protection.** Plaintiff does not recall when and where she was issued the CAEv2 earplugs.  Response to Interrogatory No. 3.  She states she received written instruction related to the CAEv2.  Response to Interrogatory No. 4.  She states she was given verbal instruction and understood that the green end of the CAEv2 functioned "like a traditional ear plug" and the yellow end provided protection but "also allowed Plaintiff to hear some ambient noise, such as voices of those nearby."  Response to Interrogatory No. 4. At her deposition, however, she could not recall training or instruction provided regarding the use of the CAEv2 earplugs.  Depo p. 62.

In her interrogatory responses Plaintiff states that she does not recall every instance where she wore the CAEv2, and that she believes she wore it in the following circumstances:

> Basic training, gun ranges, training exercises, operating heavy duty equipment, flight training, flight line, on board aircraft/military vehicles; patrol, during deployment, when instructed by a commanding officer, firefights with enemy combatants, etc.

Response to Interrogatory 5. The reference to firefights with enemy combatants is notable given Plaintiff's testimony that she never had live gunfire engagements with the enemy while deployed to Iraq. Depo p. 50. In response to Interrogatory 6, she limits her claims of noise exposure to "while at the gun range or during trips in military vehicles." Other than the July 2017 audiogram, Ms. Roper's audiograms do not reflect any documentation as to the use of hearing protection. . She does not recall ever being instructed to utilize the CAEv2 earplugs. Depo. p. 50. She does not recall what the CAEv2 earplugs look like. Depo p. 53.

Plaintiff's deposition reflects that she frequently utilized disposable hearing protection when exposed to loud noise. She testified that she did not recall which hearing protection she used during basic training in 2001 and did not recall what hearing protection she used later in her military career during weapons training. Depo p. 42, 48. In response to being questioned whether she used the Combat Arms earplugs she said "yes," but later recalled that the earplugs she used were provided at the gun range, and that after completing weapons training sessions at the gun firing range, she would throw away her hearing protection. Depo p. 42, 52, 65. The trash can she threw them into was on the site of the shooting range. Depo p. 76. These protection devices that she used during weapons training came in little bags in a box and "we would just grab the bags that were in the box." Depo p. 66. She said when she was given her hearing protection device it was "just a little small plastic bag that – it had some writing on it." Depo p. 64. She used this same type of earplug during weapons training throughout her career. Depo p. 71. When asked if she ever used foam earplugs that "look like little pills," she responded, "I believe once or twice before on the range." Depo p. 73. She testified that the "box of earplugs" she would take a bag from contained "all the same" type of earplug, and she when asked if that "would have been the Combat Arms earplug" she responded "yes." Depo p. 74. She recalls sometimes the in-ear protection she was using would loosen. Depo p. 74. As described these clearly are not the CAEv2 earplugs and instead fit the description of hand-formed foam earplugs. She could not specifically remember the hearing protection she used when riding in Humvees, but stated that after riding in Humvees she would throw away the hearing protection devices that she used. Depo p. 58, 67. She answered "yes" to the question whether she could hear fellow passengers when in the Humvee using the CAEv2 earplugs, but this response is inconsistent with her recollection of using disposable earplugs in the Humvee. Depo p. 72. She wore a helmet when in the Humvee which she says was not equipped with a radio. Depo p. 60. She could not recall which hearing protection she used when riding in a 2.5 ton truck or C 130 aircraft. Depo p. 60, 61. At her weapons training sessions post-deployment she used the same throw-away type of hearing protection. Depo p. 71.

**Noise Exposure in the Military.** Ms. Roper's noise exposure largely consists of weapons training and driving in the Humvee and 2.5 ton truck. Depo p. 49. She operated the Humvee at least two to three times per week. Depo p. 58. She drove the 2.5 ton truck once or twice. Depo p. 60. She engaged in weapons training throughout her military career, and recalls firing her M16 and 9mm at the range twice per year after basic training. Depo p. 48, 51-52, 70. It is notable that Ms. Roper testifies that she cannot remember what hearing protection devices she used when subjected to this noise, and that her most reliable description of the hearing protection she utilized reflects that she used hand-formed foam ear protection during these noise exposures.

Ms. Roper denies significant noise exposure in the mail room in Baghdad, saying there would sometimes be noise from a forklift. Depo p. 62.

She recalls one explosion in Baghdad outside of the building she was working in and does not recall how far away it was. Depo p. 55. She recalled it being a "loud noise." Depo p. 57. She does not remember if she was wearing hearing protection when the explosion took place, but typically would not have been wearing hearing protection in that situation. Depo p. 57. Following the explosion, she was evacuated to a holding area. Depo p. 58.

**Noise Exposure Outside the Military.** Ms. Roper reports engaging in outdoor recreational firearms shooting from 2017 to 2018, once or twice a year. Depo p. 31-32. We do not know the type of hearing protection used, if any, the type of weapon utilized, or the duration of noise exposure.

## IV.     PLAINTIFF'S AUDIOLOGY AND MEDICAL HISTORY

Audiometric data for Ms. Roper reveals that she suffered no permanent threshold shifts or hearing loss during her period of military service, which includes any time she claims she used the CAEv2 earplugs.

### A.  Audiometric Testing

#### Pure Tone Thresholds for Roper, Shanika Left Ear

| Date | 0.25 kHz | 0.5 kHz | 1 kHz | 2 kHz | 3 kHz | 4 kHz | 5 kHz | 6 kHz | 7 kHz | 8 kHz |
|---|---|---|---|---|---|---|---|---|---|---|
| 04/1/2005 | - | 5 | 0 | 0 | 0 | 0 | - | 20 | - | NT |
| 09/5/2006 | - | 25 | -5 | -5 | -5 | 0 | - | 25 | - | NT |
| 12/3/2009 | - | 00 | 00 | 05 | 00 | 10 | - | 15 | - | NT |
| 04/2/2015 | - | -5 | -5 | 0 | -5 | 5 | - | 5 | - | NT |
| 04/16/2016 | - | 0 | 0 | 0 | 0 | 5 | - | 20 | - | NT |
| 04/8/2017 | - | 15 | 5 | 5 | 0 | 5 | - | 20 | - | NT |
| 07/7/2017 | - | 0 | 0 | 0 | -5 | 5 | - | 10 | - | NT` |
| 03/15/2022 (DME) | 15 | 15 | 10 | 10 | 10 | 15 | - | 15 | - | 20 |

## Pure Tone Thresholds for Roper, Shanika Right Ear

| Date | 0.25 kHz | 0.5 kHz | 1 kHz | 2 kHz | 3 kHz | 4 kHz | 5 kHz | 6 kHz | 7 kHz | 8 kHz |
|---|---|---|---|---|---|---|---|---|---|---|
| 04/1/2005 | - | 5 | 0 | 0 | 0 | 5 | - | 20 | - | NT |
| 09/5/2006 | - | 0 | -5 | -5 | -5 | -5 | - | 20 | - | NT |
| 12/3/2009 | - | 00 | 00 | 00 | 00 | 05 | - | 10 | - | NT |
| 04/2/2015 | - | -5 | -5 | -5 | -5 | 0 | - | 5 | - | NT |
| 04/16/2016 | - | 0 | 0 | 0 | 0 | 0 | - | 5 | - | NT |
| 04/8/2017 | - | 20 | 5 | 5 | 5 | 5 | - | 10 | - | NT |
| 07/7/2017 | - | 5 | -5 | 0 | -5 | -5 | - | 0 | - | NT |
| 03/15/2022 (DME) | 15 | 10 | 10 | 10 | 10 | 10 | - | 10 | - | 15 |

### B.  Claim of Hearing Loss

Ms. Roper's pleadings allege she began experiencing bilateral hearing loss and tinnitus starting in 2018.  That allegation is inconsistent with  Ms. Roper's medical records, which make no mention of hearing loss throughout her time in the military and only mention tinnitus in the right ear, starting in approximately 2016. Ms. Roper testified in her February 2022 deposition that she has not experienced hearing loss related to her time in the military. Depo p. 123

### C.  Tinnitus History

Plaintiff testified that she began experiencing tinnitus in approximately 2014 or 2015, describing it as a "weird type of feeling in my – in my ear….it's like something hurts but it itches at the same time, if that makes sense." Depo p. 91, 92.  "It feels like it's, like, in the inner, inside the ear."  Depo p. 91. She added that it was a "pressure feeling."   Medical office visits in 2015 and 2017 fail to list tinnitus or hyperacusis as  complaints of hers.

Ms. Roper stated that the tinnitus is triggered by loud noise like the television or music. Depo p. 91. She states that her tinnitus is occurring less frequently because she largely avoids loud noises or areas where such noises are likely.  Depo p. 92. She listens to music.  Depo p. 93. She testified that when this happens it lasts "about a day or so." Depo p. 96. She testified that she experiences ringing in her ears approximately two times per month which "fades out over time during the day." Depo p. 98.  She also stated that the last time she felt pressure sensations was a couple of months prior to her February 2022 deposition while she was sleeping.  Depo p. 99.  She has experienced this during sleep "maybe once or twice every couple of months or so" and it does not wake her up every time. Depo p. 106. These sensations have not gotten worse since 2014-2015. Depo p. 101.  It does not prevent her from falling asleep. Depo p. 101.  She was not experiencing tinnitus at her deposition. Depo p. 90. She states that her tinnitus has not impacted her day to day life or her ability to work. Depo p. 102, 113. It has not caused any mental health issues for her. Depo p. 104.  As of February 4, 2020, there is no VA disability claims requested or given for tinnitus or hyperacusis.

### D. Other Conditions

The plaintiff reports and it is confirmed in reviewed medical records that she has been evaluated for and/or diagnosed between August 2015 and the present day with the following medical conditions:

- Anxiety and Dysthymic Disorder as of August 2015

- Major Depression was diagnosed in March 2017 with complaints of "depressed mood, anxiety, chronic sleep impairment, mild memory loss and some disturbances of motivation and mood" as of December 21, 2016. 3M_ROPER_S000538. Plaintiff did not report tinnitus at this visit in March 2017. Complaints regarding Ms. Roper's depression began in 2016. A diagnosis of adjustment disorder, anxiety and depression were made on October 17, 2017. She currently sees a psychiatrist for anxiety and depression. Depo p. 85.

- Migraine Disorder – January 1, 2015 to present. 3M_ROPER_S000111. She relates that she suffers "frequent" headaches. Response to Interrogatory No. 15. Described migraine headaches beginning January 2015, two to three times per month lasting two to three hours. She took Excedrin Migraine for this. She testified that more recently she does not have them as often but that when she does "I'm usually in the bed or in the dark for maybe a day or two." Depo p. 77. She recalled having migraine headaches in the military "maybe like once or twice a week." Depo p. 77.

- Obstructive Sleep Apnea was diagnosed in 2020 or 2021. Depo p. 107; 3M_ROPER_S000111. She "occasionally" uses her CPAP machine and thus is not always compliant with it. Depo p. 107. She was diagnosed with chronic sleep problems per a February 2, 2018 medical evaluation. Inadequately treated obstructive sleep apnea results in excessive daytime sleepiness, mood changes, and exacerbation of clinically insignificant tinnitus.

- Temporal Mandibular Joint (TMJ) Syndrome reported to have started around 12/2016. – In a December 12, 2017 record, she complained of the symptoms of the teeth grinding at that visit. TMJ is noted with description of grinding teeth associated with anxiety and depression. It has been reported that patients who grind their teeth awaken with pressure and aching in their ears, and TMJ syndrome is associated with and is a probable causative agent in the complaint of aural fullness.

- PTSD. Depo p. 104. Loud noises trigger PTSD for her. Depo p. 104. However, her medical records do not validate her claim of PTSD. 3M_ROPER_S000886

- Energy drinks – she was ingesting these daily as of 9/28/2015.

- Ms. Roper has been referred for treatment for a gastrointestinal condition where her body does not release waste. Depo p. 85.

- She was evaluated for atypical chest pain.
- Serious automobile accident in December 2017 where the car was totaled. No information was made available on airbag deployment. Airbag deployment can cause or exacerbate existing tinnitus and/or hearing loss. Whiplash injuries are also known to cause or exacerbate tinnitus.

All of the above conditions can exacerbate clinically insignificant tinnitus and some of these conditions can directly cause tinnitus.

Ms. Roper has degenerative arthritis of the spine and lumbosacral/cervical strain. She describes this as throbbing back pain, and that her back hurts when sitting, standing, or walking for a long time. This pain may be caused by degenerative arthritis of the spine which began in 2003 (3M_ROPER_S000521-532; 3M_ROPER_S000111). Ms. Roper has a history of NSAID use.

She was in a car accident in 2017 and experienced neck and low back pain following this incident. 3M_ROPER_S005118; Depo p. 28. It is not known if an airbag was deployed. She underwent physical therapy for this for about six months. Depo p. 87.

## V. OPINIONS

### A. Ms. Roper's Claim of Hearing Loss is Not Attributable to Her Use of the CAEv2

Ms. Roper's Surveillance Audiometric testing from April 2005 to April 8, 2017 to March 15, 2022 inclusive of seven exams does not demonstrate any auditory deficits and does not reflect any temporary or permanent auditory threshold shifts. This objective audiometric data thus reflects that Ms. Roper does not suffer from any permanent hearing loss. Further, it demonstrates that any noise exposure she experienced during her military service did not cause any permanent hearing loss or damage. It is therefore my opinion that Ms. Roper's use of the CAEv2 earplugs did not cause or contribute to any hearing loss in this case.

**Differential Diagnosis.** In assessing Ms. Roper's claim of hearing loss notwithstanding the objective data reflecting *no* hearing loss, to the extent Ms. Roper claims that she does experience hearing loss, I have considered the following factors which generally can be implicated in determining the cause of hearing loss in patients:

- Military Noise Exposure with other HPDs. As described above Ms. Roper has a significant degree of noise exposure while using hearing protection devices other than the CAEv2. She was able to describe specific details about the hearing protection she used, and this description does not match in any way that of the CAEv2. Notwithstanding her affirmative responses when asked about use of the CAEv2, the balance of her testimony clearly suggests use of hearing protection

that is not the CAEv2. The use of this other hearing protection and the noise exposure during it cannot be excluded as a factor in causing or contributing to any hearing damage in this case.

- Military Noise Exposure with no HPDs and Blast Exposure.  It is likely that Ms. Roper did not have on hearing protection when the explosion occurred near her mail room in Iraq.  Without further details as to the distance of the explosion, this cannot be excluded as a factor which could cause or contribute to her claimed hearing damage.

- Traumatic Brain Injury.  The record is silent as to whether Ms. Roper may have suffered a head injury during her motor vehicle accident in 2017. In the absence of further information, the possibility of TBI cannot be ruled out as playing a role in this case.

- Conductive Hearing Loss.  There is no evidence of hearing loss in this case, therefore conductive hearing loss does not play a role in this case.

- Toxin exposure.  There is no record of relevant toxin exposure in this case, but without more information, this cannot be excluded as a factor causing or contributing to any hearing damage.

- Age.  Ms. Roper is 40 years old.

- Alcohol and Tobacco. This record does not reflect a relevant history of alcohol or smoking.

- CAEv2 Usage. In light of the foregoing, Ms. Roper's usage of the CAEv2 earplug can be ruled out as causing or contributing to her claim of hearing damage.

### B.  Ms. Roper's Tinnitus Cannot be Attributed to Her CAEv2 Use

As set out above, the audiometric evidence in this case demonstrates that there was no temporary or permanent threshold shift from April 2005 to March 2022.  Any symptoms of tinnitus experienced by Ms. Roper therefore cannot be attributed to her use of the CAEv2 earplugs.  Further, many of the symptoms Ms. Roper associates with "tinnitus" are not typically considered symptoms of tinnitus.  The itch and ache she describes in her inner ear is not generally considered a symptom of tinnitus.  Those symptoms are known to be associated with TMJ; a condition Ms. Roper has.  This condition and the symptoms she describe is also known as a type of "somatic tinnitus."

Regarding her symptoms which *do* fit within the category of tinnitus – the ringing in her ear occurring twice per month – this falls within the norm of clinically insignificant tinnitus in the general population.

With respect to Plaintiff's expert's claim of hyperacusis, it is important to note that hyperacusis is associated with the conditions of migraines, depression, and post-traumatic stress disorder. Plaintiff's testimony that loud noises trigger a PTSD response is significant in this regard. Further, hyperacusis is not a condition typically associated with noise induced damage. Loudness recruitment, the symptoms of which plaintiff does not claim, describes an experience commonly associated with cochlear hearing loss and specifically with dysfunction of the outer hair cells of the organ of corti. With this condition, as sound level rises the perceived loudness of it increases faster than normal. The audiometric data in this case reflects no hearing loss or damage. The symptoms which Plaintiff or her expert attributes to hyperacusis cannot be attributed to her use of the CAEv2 earplugs.

**Differential Diagnosis.** In assessing Ms. Roper's claim of tinnitus, I have considered the following factors which generally can be implicated in determining the cause of tinnitus in patients:

- Somatic tinnitus. Ms. Roper suffers from TMJ. The symptomatology she describes is entirely consistent with her TMJ. It is more likely than not that her TMJ causes and/or contributes to the symptoms she attributes to tinnitus.

- Military Noise Exposure with other HPDs. As described above Ms. Roper has a significant degree of noise exposure while using hearing protection devices other than the CAEv2. She was able to describe specific details about the hearing protection she used, and this description does not match in any way that of the CAEv2. Notwithstanding her affirmative responses when asked about use of the CAEv2, the balance of her testimony clearly suggests use of hearing protection that is not the CAEv2. The use of this other hearing protection and the noise exposure during it cannot be excluded as a factor in causing or contributing to her claims of tinnitus in this case.

- Military Noise Exposure with no HPDs and Blast Exposure. It is likely that Ms. Roper did not have on hearing protection when the explosion occurred near her mail room in Iraq. Without further details as to the distance of the explosion, this cannot be excluded as a factor which could cause or contribute to her claimed tinnitus.

- Traumatic Brain Injury. The record is silent as to whether Ms. Roper may have suffered a head injury during her motor vehicle accident in 2017. In the absence of further information, the possibility of TBI cannot be ruled out as playing a role in her tinnitus.

- Whiplash. Similarly, whiplash has been associated with tinnitus and changes in tinnitus in patients. The injury Ms. Roper suffered in her motor vehicle accident cannot be excluded as a factor which could cause or contribute to her tinnitus.

- Conductive Hearing Loss. The audiometric evidence reflects no hearing loss, so conductive hearing loss is not a factor in this case.

17

- PTSD.  PTSD is a known contributory factor for tinnitus. Ms. Roper's PTSD cannot be excluded as a factor which causes or contributes to her claim of tinnitus.

- Sleep apnea. Ms. Roper has sleep apnea and is not always compliant with use of her CPAP machine. Sleep apnea is a known factor which can cause or contribute to tinnitus. It cannot be excluded as a factor in this case which causes or contributes to Ms. Roper's claim of tinnitus.

- Depression and Anxiety. Ms. Roper has depression and anxiety and seeks treatment for her depression.  These are both known factors which can cause or contribute to tinnitus. They cannot be excluded in this case as factors which could cause or contribute to Ms. Roper's tinnitus.

- Migraine.  Migraine disease is known to cause or contribute to symptoms of tinnitus and it cannot be excluded as causing or contributing to Ms. Roper's claim of tinnitus.

- Toxin exposure. There is no record of relevant toxin exposure in this case, so this does not play a role in this case, but without more information, this cannot be excluded as a factor causing or contributing to any hearing damage.

- Medication usage.  Ms. Roper has taken Excedrin for her migraine headaches. Excedrin contains aspirin which is a known factor that can cause or contribute to tinnitus. She has taken NSAIDs which are also implicated in causing or contributing to tinnitus.  Her use of this medication cannot be excluded as a factor which could cause or contribute to her tinnitus.

- Alcohol and Tobacco.  This record does not reflect a relevant history of alcohol or smoking.

- CAEv2 Usage. In light of the foregoing, Ms. Roper's usage of the CAEv2 earplug can be ruled out as causing or contributing to her claim of tinnitus.

### C.  Plaintiff's Expert Report

I have reviewed Plaintiff's expert report of Richard Tyler, Ph.D., and I disagree with his opinions for the below reasons:

- Plaintiff's expert summarily discounts sleep apnea as playing a role in Ms. Roper's claimed hearing damage.  I disagree that it can be discounted in this case. To the extent Plaintiff's expert fails to account for other medical conditions of Ms. Roper relevant to her hearing damage claims, I disagree with that methodology.

- Plaintiff's expert states that Ms. Roper's medication history played no role in her hearing damage claims.  I disagree with that statement (see discussion above)

18

- I note that the Plaintiff's characterization of her tinnitus in the March expert report – "ringing in her ears [that] comes and goes, occurring approximately five times a month" and which "can last all day and will sometimes interfere with her sleep" is starkly different from the account she gave at her deposition in February, where she described ringing once or twice a month that would diminish and would not prevent her from going to sleep.

- Plaintiff's expert report fails to account for Ms. Roper's use of hearing protection other than the CAEv2. It does not address the audiometric data in this case which reflects no hearing loss. I disagree with that aspect of the report.

- Plaintiff's expert mentions synaptopathy or hidden hearing loss as a focal point of his research. To the extent this reflects an intention to rely on this theory in this case, this is an unreliable basis for the claim that noise exposure while utilizing the CAEv2 earplugs resulted in hearing damage in Ms. Roper's case. This theory is not generally accepted in the practice of otolaryngology. It has not been tested or proven in human

- Plaintiff's expert did not rule out all potential causes of tinnitus.

## VI. CONCLUSION

The audiometric data in this case objectively demonstrates that Ms. Roper did not experience any permanent hearing loss due to noise exposure while serving in the military. Her use of the CAEv2 earplug accordingly played no role in her claimed hearing damage or hearing loss. In the absence of permanent auditory threshold shifts during her military service and claimed usage of the CAEv2 earplugs, her claims of hyperacusis and tinnitus cannot be attributed to her use of the CAEv2 earplugs. As discussed in my opinions above, there are several environmental exposures and medical conditions in her personal history which are known to cause, contribute to and/or exacerbate tinnitus and these serve as the likely explanation for the tinnitus she claims.

I reserve the right to amend and/or supplement my opinions based on any new material, information, evidence or testimony in this case.

_Alan C. Pollak_

Alan Pollak, M.D.

_5/10/22_

Date

# REFERENCES

1.  Baguley DM. *Hyperacusis.* J R Soc Med, 2003 Dec; 96(12): 582-585. doi: 10.1258/jrsm.96.12.582

2.  Bhatt JM, et al. *Tinnitus Epidemiology: Prevalence, Severity, Exposures and Treatment Patterns in The United States.* JAMA Otolaryngol Head Neck Surg. 2016 Oct 1: 142(10): 959-965. doi: 10.1001/jamaoto.2016.1700

3.  Bhatt JM, et al. *Epidemiology of Firearm and Other Noise Exposures in the United States.* Laryngoscope. 2017 October; 127(10): E340-E346. doi: 10.1002/lary.26440

4.  Burry M. *How we hear: A step-by-step explanation.* https://www.healthyhear ing.com /report/53241-How-we-hear-explainer-hearing (2021)

5.  Danielson R. *What is Considered a Standard Threshold Shift?* AudiologyOnline February 6, 2006

6.  Dougherty AL, et al. *Blast-related ear injuries among U.S. military personnel.* JRRD, Volume 5, Number 6 (2013)

7.  Folmer RL, et al. *Chronic Tinnitus Resulting from Head or Neck Injuries.* Laryngoscope, 113:821-827, 2003

8.  Hasson D, et al. *Acute stress induces hyperacusis in women with high levels of emotional exhaustion.* PLoS One. 2013;8(1):e5294S. doi: 10.1371/journal.pone.0052945. Epub 2013 Jan 2

9.  Holmes E, et al. *'Normal' hearing thresholds and fundamental auditory grouping processes predict difficulties with speech-in-noise perception.* Scientific Reports (2019) 9:16771 / https://doi.org/10.1038/s41598-019-53353-5

10. Jokel C, et al. *Noise of military weapons, ground vehicles, planes and ships.* The Journal of the Acoustical Society of America (2019)

11. Joseph AR, et al. *Impact of Blast Injury on Hearing in a Screened Male Military Population.* American Journal of Epidemiology, Volume 187, Issue 1, January 2018, Pages 7-15, https://doi.org/10.1093/aje/kwx199

12. Kujawa SG, et al. *Acceleration of Age-Related Hearing Loss by Early Noise Exposure: Evidence of a Misspent Youth.* J. Neurosci, February 15, 2006, 26(7):2115-2123

13. Lee SJ, et al. *Diagnosis of Tinnitus Due to Auditory Radiation Injury Following Whiplash Injury: A Case Study.* Diagnostics 2020, 10, 19; doi: 10.3390/diagnostics10010019

14. Lugo A, et al. *Relationship between headaches and tinnitus in a Swedish study.* Sci Rep **10,** 8494 (2020). https://doi.org/10.1038/s41598-020-65395-1

15. MacGregor AJ, et al. *Prevalence of Tinnitus and Association with Self-Rated Health among Military Personnel Injured on Combat Deployment.* Military Medicine, Volume 185, Issue 9-10, September-October 2020, Pages e1608-e1614, https:/ /doi.org/10.1093/milmed/usaa103

16. McBride DI, et al. *Audiometric notice as a sign of noise induced hearing loss.* Occup Environ Med 2001; 58:46-51

17. McIlwain DS, et al. *Heritage of Army Audiology and the Road Ahead: The Army Hearing Program.* Am J Public Health, 2008;98:2167-2172. doi: 10.2105/AJPH.2007.128504

18. Meinke DK, et al. *Prevention of Noise-Induced Hearing Loss from Recreational Firearms.* Semin Hear; 2017 Nov; 38(4): 267-281

19. Mezri S, et al. *Ear blust injury in military population: A 12 months follow-up.* Otorhinolaryngol Head Neck Surg 4: DOI: 10.15761/OHNS.1000203 (2019)

20. Nondahl DM, et al. *Notched Audiograms and Noise Exposure History in Older Adults.* Ear Hear. 2009 December; 30(6): 696-703. doi: 10.1097/AUD.0b013e3181b1d48

21. Petrescu N. *Loud Music Listening.* MJM 2008 11(2): 169-176

22. Stewart M, et al. *Hearing Loss and Hearing Handicap in Users of Recreational Firearms.* J Am Acad Audiol 13: 160-168 (2002)

23. Williams W, et al. *Clubbing: The cumulative effect of noise exposure from attendance at dance clubs and night clubs on whole-of-life noise exposure.* Noise & Health, July-September 2010, 12:48,155-8

24. Witt B. *Bad Assumptions About Hearing Protection.* Occupational Health & Safety Sep 01, 2008

25. Wooles N, et al. *Comparison of distortion product otoacoustic emissions and pure tone audiometry in occupational screening for auditory deficit due to noise exposure.* The Journal of Laryngology & Otology (2015), 129, 1174-1181

26. Yong JS, et al. *Impact of noise on hearing in the military.* Military Medical Research (2015)2:6. doi: 10.1186/s40779-015-0034-5

## **Military**

1. Department of the Army, Headquarters, United States Army, Maneuver Support Center of Excellence, Fort Leonard Wood, Missouri 65473-5000, FLW Regulation 40-7, Medical Services, Army Hearing Program, 27 November 2019

2. U.S. Army Center for Health Promotion and Preventive Medicine (Hearing Conservation), Just the Facts, The Combat Arms Earplug 51-004-0204

3. U.S. Army Center for Health Promotion and Preventive Medicine (Hearing Conservation Program), Noise Levels of Common Army Equipment

## Publications

1. *Noise-Induced Hearing Loss*. NIH Publication No. 14-4233, Updated March 2014

2. *Occupational Noise Exposure – Workers' Rights*. Occupational Safety and Health Administration

3. Campbell KCM, et al. *Otoacoustic Emissions.* Medscape June 18, 2020

4. *Music-Induced Hearing Loss: Loud Concerts, Musicians and Hearing Loss Information for Audiologists.* University of Iowa HealthCare, Iowa Head and Neck Protocols, last modified 01/12/2022

## Other

1. Azodo AP, et al. *Investigation of Occupational Noise Exposure and Its Physiological Effect on Landscape Gardeners.* Conference Paper May 2018

2. Fracchetti F. *Noise Levels in Jazz Clubs. An Investigation into Regulations and Hearing Risks for Patrons.* SAE Institute London, , Student Number: 97507, August 6 2021

3. Groetzinger, K. "Moab and Grand County Pass New Noise Limits to Deal with ATV Complaints." KUER 90.1, Published April 28, 2021 at 8:27 PM MDT

4. Harrison RT. *Basic Acoustics for OHV Noise Control.* Harrison & Real Sound Training

5. Hill AJ, et al. *A Case Study on Sound Level Monitoring and Management at Large-Scale Music Festivals.* Proceedings of the Institute of Acoustics, Vol. 41 Pt. 3 2019

6. Miller RV. *3M Gets Blasted With $110 Million Verdict in 11th Earplug Bellwether Trial.* Lawsuit Information Center Blog, January 28, 2022, www.lawsuit-information-center.com

7. Miller RV. *3M Earplug Lawsuit Update.* Lawsuit Information Center Blog, March 21, 2022, www.lawsuit-information-center.com

8. Settlement Agreement released July 26, 2018 by DOJ, Moldex Whistleblower lawsuit

## LIST OF MATERIALS CONSIDERED FOR SHANIKA ROPER

**Case Materials**

All documents cited in my report that are not cited herein. Each cited document as well as any attachments to that document.

**Expert Reports**

Rule 26 Case-Specific Expert Report of Jennifer LaBorde, Au.D., dated April 14, 2022

Rule 26 Case-Specific Expert Report of James V. Crawford, M.D., dated December 30, 2021

Rule 26 Case-Specific Expert Report of Gregory A. Flamme, Ph.D. & Mark Stephenson, Ph.D., dated June 6, 2021

**Deposition Testimony**

Shanika Roper Deposition and Exhibits

**Production Documents**

| Document Description | MDL Centrality No. |
|---|---|
| DOEHRS-HC Data | |
| Case Census Form | 278143 |
| Verification of Census Form | 278098 |
| Verification of Census Form | 278100 |
| Plaintiff's Response to Defendants' Requests for Production | 1470302 |
| Plaintiff's Response to Defendants' Requests for Production | 1461809 |
| Plaintiff's Response to Defendants' Requests for Production | 1418044 |
| Plaintiff's Response to Defendants' Requests for Interrogatories | 1470301 |
| Plaintiff's Response to Defendants' Requests for Interrogatories | 1445026 |

| Document Description | MDL Centrality No. |
|---|---|
| Plaintiff's Response to Defendants' Requests for Interrogatories | 1418043 |
| Plaintiff's Response to Defendants' Requests for Admissions | 1470300 |
| Plaintiff's Initial Disclosures | 1439834 |
| Other | 35165 |
| Notice of DME | 1504123 |
| Notice of DME | 1496757 |
| Medical Records | 1451548 |
| Form DD 214 | 1505183 |
| Short Form Complaint | 1166231 |
| VA Touhy Response | 913006 |
| VA Touhy Response | 913005 |
| VA Touhy Response | 901799 |
| VA Touhy Response | 901798 |
| VA Touhy Response | 901797 |
| VA Touhy Response | 901796 |
| DOD Touhy Response | 1098449 |
| DOD Touhy Response | 1098448 |
| CAEv2 Just the facts [3M_MDL000055849-55850] | |
| CAEv2 Photo | |
| Wallet Card [3M_MDL000229332] | |
| DOD Touhy Response | 1588189 |
| DME Data | 1571181 |

| Document Description | MDL Centrality No. |
|---|---|
| Plaintiff's Expert Disclosures | 1647359 |

# EXHIBIT B

# Curriculum Vitae

## Alan C. Pollak, MD

---

| | |
|---|---|
| Home: | 55 East Erie (unit 4003)<br>Chicago, IL 60611 |
| Main:<br>Office | 9150 North Crawford Avenue (Suite 206) - Private Practice 1993-Present<br>Skokie, IL 60076 |

Email:     apollak@yahoo.com
Cell Phone:   847/840-8250

**SINAI MEDICAL GROUP:**
**MOUNT SINAI HOSPITAL**

| | |
|---|---|
| Chairman, Department of Surgery | 06/2017-Present |
| President, Sinai Medical Group | 06/2017-12/2017 |
| Interim Chairman, Department of Surgery | 03/2017-05/2017 |
| Secretary, Mount Sinai Medical Staff Office | 03/2017-07/2018 |
| Chief, Division of Otolaryngology/Head and Neck Surgery | 2012-Present |

**UNIVERSITY OF ILLINOIS AT CHICAGO**

| | |
|---|---|
| Clinical Assistant Professor of Surgery | 03/2017-Present |

**FRANCISCAN HAMMOND CLINIC**
**MUNSTER, IN**

| | |
|---|---|
| Attending Otolaryngologist | 2010-2012 |

**EDUCATION:**

| | |
|---|---|
| Undergraduate:   Northwestern University, BA     Phi Beta Kappa | 1979-1983 |
| Research Fellowship – Anatomic Pathology – Lutheran General Hospital | 1983-1984 |
| Medical School:   Rush Medical College, MD | 1984-1988 |

**POST GRADUATE TRAINING:**

| | | |
|---|---|---|
| Internship | Northwestern University, McGaw Medical Center<br>General Surgery | <br>1988-1989 |
| Residency | Northwestern University, McGaw Medical Center<br>General Surgery/Otolaryngology/Head and Neck Surgery | <br>1989-1993 |

| | |
|---|---|
| **CERTIFICATION:**   American Board of Otolaryngology/Head and Neck Surgery | 1994-Present |

## HOSPITAL AFFILIATIONS:

| | |
|---|---|
| Lutheran General Hospital | |
| Park Ridge, IL | 1993-Present |
| North Shore University | |
| Skokie, IL | 1993-Present |
| Louis Weiss Memorial | |
| Chicago, IL | 1998-Present |
| Illinois Masonic Medical Center | |
| Chicago, IL | 2000-Present |
| St. Joseph's Hospital | |
| Chicago, IL | 2003-Present |
| St. Mary's Medical Center | |
| Chicago, IL | 2009-Present |
| Swedish Covenant Hospital | |
| Chicago, IL | 2010-Present |
| St. Bernard Hospital | |
| Chicago, IL | 2012-Present |
| Mount Sinai Hospital | |
| Chicago, IL | 2013-Present |
| St Frances Hospital | |
| Evanston, IL | 2001-2016 |

## HOSPITAL ADMINISTRATIVE POSITIONS:

St. Mary's and St. Elizabeth's Medical Center
 Section Chief, Otolaryngology/Head and Neck Surgery  2013-2015
Louis Weiss Memorial
 Director, Head and Neck Surgery  2014-2015
Mount Sinai Hospital
 Section Chief, Otolaryngology/Head and Neck Surgery  2012-Present
Mount Sinai Hospital
 Interim Chairman of Surgery  03/2017-06/2017

## ADDITIONAL ADMINISTRATIVE POSITIONS:  1996-2010

Surgical Advisory Committee
Credentials Committee/Medical Executive Committee

## LICENSURE:

State of Illinois Physician and Surgeon  1990-Present
State of Indiana Physician and Surgeon  2011-2012

## PUBLICATIONS:

Videolaryngoscopic evaluation of laryngeal intubation injury: Incidence and predictive factors.
Steven F. Ellis, MD, Alan C. Pollak, MD, Otolaryngol Head Neck Surg 1996:114:729-31.

# EXHIBIT 2

1  IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
2  PENSACOLA DIVISION
3
4  IN RE: 3M COMBAT ARMS          )
EARPLUG PRODUCTS               )
5  LIABILITY LITIGATION           ) Case No.
_____ ) 3:19-md-2885-MCR-GRJ
6                                  )
This Document Relates to:      ) Judge M. Casey
7      Shanika Roper              ) Rodgers
                                   )
8  Civil Case No.:                ) Magistrate Judge
7:20-cv-02945-MCR-GRJ          ) Gary R. Jones
9
10
11      DEPOSITION OF ALAN C. POLLAK, M.D.
12              June 17, 2022
13
14      Remote deposition of ALAN C. POLLAK, M.D.,
15  conducted at the location of the witness in
16  Chicago, Illinois, commencing at 9:00 a.m. CST, on
17  the above date, before CORINNE T. MARUT, C.S.R. No.
18  84-1968, Registered Professional Reporter,
19  Certified Realtime Reporter and Notary Public.
20
21
22          GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
23               deps@golkow.com
24

1    sir.

2    BY MR. BAUER:

3        Q.    Okay.  And you go on to say that "Any

4    symptoms of tinnitus experienced by Ms. Roper

5    therefore cannot be attributed to her use of the

6    CAEv2 earplugs."  Correct?

7        A.    That's correct.

8        Q.    Is it your medical opinion that

9    noise-induced tinnitus can never occur without the

10   presence of either a permanent or temporary

11   threshold shift?

12       A.    90% of patients with tinnitus

13   demonstrate some documentable hearing loss.

14       Q.    So, the answer to my question is no,

15   that is not your medical opinion.

16       A.    That would be correct.

17       Q.    Okay.  Doctor, do you need a break?  I

18   think we have about another half hour.  We can keep

19   going or take a break.

20       A.    Give me five minutes and that's it.

21       MR. BAUER:  We will go off the record.

22       THE WITNESS:  Thanks.

23                  (WHEREUPON, a recess was had

24                   from 11:08 to 11:13 a.m.)

1    that you have not looked at these three reports.

2    Is that true?

3           A.    That is correct.

4           Q.    Okay.  And so -- okay.  Strike that.

5                 Are you aware that there are multiple

6    causation reports on the Plaintiff's side that are

7    similar to these that state that the Combat Arms

8    earplugs were defective?

9           A.    I have not, to be very honest with you,

10   read any of those reports.

11          Q.    Okay.  So, is it safe to say that you

12   haven't reviewed any expert reports regarding the

13   efficacy of the Combat Arms earplugs?

14          A.    That would be very safe to say, correct.

15          Q.    Okay.  So I noticed on page 22 of your

16   reference material pages that there are a few

17   entries that I'd like to talk to you because they

18   kind of stick out to me.

19                The first is No. 6.  Do you see where

20   I'm referring to?

21          A.    Yes.

22          Q.    It's under a heading of "Other."

23                And No. 6 is Miller RV.  The title is

24   "3M Gets Blasted With $110 Million Verdict in 11th