# EXHIBIT 1

```
 1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF FLORIDA
 2                  PENSACOLA DIVISION

 3

 4   IN RE: 3M COMBAT ARMS         )
     EARPLUG PRODUCTS              )
 5   LIABILITY LITIGATION          ) Case No.
     _____  ) 3:19-md-2885-MCR-GRJ
 6                                 )
     This Document Relates to:     ) Judge M. Casey
 7         Shanika Roper           ) Rodgers
                                   )
 8   Civil Case No.:               ) Magistrate Judge
     7:20-cv-02945-MCR-GRJ         ) Gary R. Jones
 9

10

11         DEPOSITION OF ALAN C. POLLAK, M.D.
12                   June 17, 2022

13

14       Remote deposition of ALAN C. POLLAK, M.D.,
15   conducted at the location of the witness in
16   Chicago, Illinois, commencing at 9:00 a.m. CST, on
17   the above date, before CORINNE T. MARUT, C.S.R. No.
18   84-1968, Registered Professional Reporter,
19   Certified Realtime Reporter and Notary Public.
20
21
22            GOLKOW LITIGATION SERVICES
           877.370.3377 ph | 917.591.5672 fax
23                  deps@golkow.com
24
```

```
 1                    APPEARANCES
           All Parties Appearing Via Zoom Videoconference
 2

 3   ON BEHALF OF THE PLAINTIFF:
 4         REICH & BINSTOCK, LLP
           4265 San Felipe, Suite 1000
 5         Houston, Texas  77027
           713-622-7271
 6         BY:  JOSHUA H. BAUER, ESQ.
                jbauer@reichandbinstock.com
 7

 8

 9   ON BEHALF OF DEFENDANTS 3M COMPANY, 3M OCCUPATIONAL
     SAFETY LLC, AEARO TECHNOLOGIES LLC, AEARO HOLDING,
10   LLC, AEARO INTERMEDIATE, LLC and AEARO, LLC:
11
           BOWMAN AND BROOKE LLP
12         2901 Via Fortuna Drive, Suite 500
           Austin, Texas  78746
13         512-874-3800
           BY:  PATRICK L. DELAUNE, ESQ.
14              patrick.delaune@bowmanandbrooke.com
15
16   ALSO PRESENT:
17         ANDREW HARTFORD,
                Kirkland & Ellis LLP
18
19
20
21   REPORTED BY:  CORINNE T. MARUT, C.S.R. No. 84-1968
22
23
24
```

1      A.   150 decibels, the hearing protection

2 devices -- depending on, again, the duration.

3           So, at 150 with a short duration, the

4 answer is yes, especially in the military, there

5 have been recommendations made that patients -- not

6 patients -- soldiers or anyone exposed, in some

7 cases use double hearing protection, meaning

8 inserts and head muffs.  But, again, it depends on,

9 when you're talking about 150, the duration of

10 that.

11     Q.   Fair enough.

12     A.   And there is guidelines that indicate,

13 and I can't quote it, but at levels that are

14 completely acceptable at a short duration, within

15 minutes would not be acceptable with or without

16 hearing protection at a longer, you know, duration

17 level.

18     Q.   Okay.  Thank you.

19     A.   Not intensity level.

20     Q.   I'm going to move down to toxin

21 exposure.  Do you see where I'm referring to in

22 your differential diagnosis on page 18?

23     A.   Yes, I see.

24     Q.   You state, "There is no record of

1 relevant toxin exposure in this case."  Correct?
2      A.    That's correct.
3      Q.    Based on that, sitting here today, with
4 the information that you have been provided, you
5 would agree that there is no evidence that
6 Ms. Roper's tinnitus was caused by exposure to
7 toxins, correct?
8      A.    Well, what I said is cannot be excluded.
9 So, there is a mischaracterization of what I
10 indicated.
11           I said, "There is no record of relevant
12 toxin exposure in this case," based on my records
13 I've reviewed.  "So this does not play a role in
14 this case."  Again, based on the records I
15 reviewed.
16     Q.    Sure.
17     A.    "But without more information, this
18 cannot be excluded as a factor causing or
19 contributing to any hearing damage."
20     Q.    Right.  I know what your report says.
21 What I'm asking you is:  Sitting here today, as an
22 expert in this case, you can't point me to anything
23 to say Ms. Roper's tinnitus was caused by toxin
24 exposure.  True?

1  A.  Correct, consistent with what I stated
2  in the record, yes.  Based on my review of the
3  medical records provided by me, that's correct,
4  sir, yes.
5  Q.  And then we are going to move to
6  medication usage.
7      You referred to NSAIDs and aspirin usage
8  as being known causes of tinnitus, correct?
9  A.  Yeah.  They're two different -- well,
10 there are two different categories.  With the
11 Excedrin and the NSAIDs, yeah.
12 Q.  Okay.  Is tinnitus a common side effect
13 of taking aspirin?
14 A.  Yes.
15 Q.  If I went home and I had a headache and
16 I would take aspirin, how likely is it that I would
17 develop symptoms of tinnitus?
18     MR. DeLAUNE:  Objection; form.
19 BY THE WITNESS:
20 A.  It depends --
21 BY MR. BAUER:
22 Q.  You can answer.
23 A.  Okay.  Thank you.
24     It depends on your own physiology, but

1  it also more importantly depends on the dosing of
2  aspirin and the number of aspirin because aspirin
3  has a long half-life and there is both an initial
4  effect and then there is a cumulative effect.
5           So, if you're taking one aspirin in a
6  given day, there is a very low chance -- let's say
7  for cardioprotective purposes -- there is a very
8  low chance that it would cause tinnitus in someone,
9  although it might, and I've seen it exacerbate
10 tinnitus in somebody who already may have tinnitus
11 for another reason, but if you take multiple
12 aspirin, tinnitus can clearly occur.
13          And since it's cumulative, lasting in
14 your system for a week, it's just not the four that
15 day or the five or the three.  You have to look at
16 day 3, day 4, day 5, you still have significant
17 levels of medication in your system and it can
18 cause tinnitus and other issues.
19      Q.   How much aspirin does Ms. Roper take
20 regularly?
21      A.   It is not known to me except that she
22 was taking -- I don't have any pharmaceutical
23 records -- she was taking frequent Excedrin for her
24 migraine headaches.

1    Q.    What does frequent mean, Dr. Pollak?

2    A.    That, I don't have anything in the
3 medical record to indicate the frequency of it.  I
4 just commented on it since I did not agree in any
5 way with the assertion made in the Plaintiff
6 disclosure by the Plaintiff expert that when the
7 list of medications were reviewed, that that was
8 completely, without any question, an exclusion.

9    Q.    Okay.  Is tinnitus a common side effect
10 of taking NSAIDs?

11   A.    Well, in the literature, NSAIDs are
12 non-steroidal anti-inflammatories.  So, the answer
13 is yes and no.

14         Non-steroidal means basically not taking
15 prednisone, although classically many of us now
16 differentiate aspirin from non-steroidals that
17 we're all familiar with like COX-1 and COX-2
18 inhibitors.  You and I would know as like Motrin or
19 Advil and Celebrex and things like that.

20         So -- but -- so, there is literature to
21 support -- in some literature to support that the
22 classic non-steroidals, excluding aspirin, may also
23 exacerbate or cause tinnitus, correct.

24   Q.    And is it the same as with aspirin, that

1  you would have to know the dosage and the frequency
2  of use to determine whether or not someone was
3  likely to have tinnitus caused by their intake of
4  NSAIDs?
5      A.    Yes, I would agree with that.  I think
6  there is a significant variability in terms of from
7  patient to patient as to the dose.
8            And obviously it would have to do with
9  their -- you know, their mechanisms of bioclearance
10 and obviously their body habitus and things like
11 that.  So, whether these things are renally or
12 hepatically cleared in the body, correct.
13     Q.    Sure.  And sitting here today, you can't
14 tell me the dosage or the frequency of use of
15 Ms. Roper ingesting NSAIDs, correct?
16     A.    No, I cannot.
17     Q.    Okay.  There is no way for you to
18 determine that Ms. Roper's tinnitus was more likely
19 than not caused by her use of aspirin, correct?
20     A.    No, I cannot tell you in terms of this
21 being a sole cause or the contribution to that.  I
22 can just tell you what my experience is based on 30
23 years and my understanding of the literature and my
24 training has taught me and what my clinical

1  practice has allowed me to see over the 30 years
2  with patients taking those medications.
3      Q.   Same answer for NSAIDs?
4      A.   Yes, sir.
5      Q.   Okay.  Perfect.  Thank you.
6           And the last bullet point, CAEv2 usage.
7  "In light of the foregoing, Ms. Roper's usage of
8  the CAEv2 earplug can be ruled out as causing or
9  contributing to her claim of tinnitus."
10          Did I read that correctly?
11     A.   Yes.
12     Q.   Is it your opinion that there is a 0%
13 chance that Ms. Roper's usage of the Combat Arms
14 earplugs caused her tinnitus?
15     A.   I can certainly not say a 0%, but I do
16 not see any evidence that I'm aware of based on my
17 review of the medical records that it caused
18 anything.
19          I'm not really a biomedical engineer, an
20 acoustic engineer or anything like that.  But
21 basically -- and I wasn't here to like study the
22 design or the status of this plug.
23          But I do know that I believe that it did
24 not cause the auditory damages as claimed, and I

1  terms of the product itself.  I reviewed solely the
2  medical records, the submission reports and the
3  otologic, audiologic complaints of Ms. Roper, and
4  looked at those and determined whether I believe
5  they existed and then, more importantly, many
6  factors I identified that clearly would explain
7  what I consider negligible complaints but, more
8  importantly, complaints that I do not believe, no
9  matter what the status of a hearing protective
10 device is, were from noise exposure or certainly
11 could be, but there were many other variables.
12         So, I did not in any way study, did not
13 in any way study the device itself, that's correct.
14      Q.   So, you can't offer an opinion one way
15 or the other as to whether or not the Combat Arms
16 earplugs were effective?
17      A.   I can't comment --
18      MR. DeLAUNE:  Objection; form.
19 BY THE WITNESS:
20      A.   I can comment in this particular case
21 that I don't believe the patient in many situations
22 in terms of the complaints has -- that noise
23 exposure is a contributing or in any way or
24 causative factor in these complaints, and I have

1  offered multiple alternate concepts that are --
2  that I believe would be responsible.
3          But I cannot comment on the plug itself.
4  But since -- but I can go back to the plug saying I
5  do not believe that this plug caused -- caused the
6  reported deficits being reported by the Plaintiff,
7  but I don't have any independent knowledge or --
8  either in any way of the device itself or, you
9  know, or claims that it was or was not defective.
10      MR. BAUER:  Objection; non-responsive.
11 BY MR. BAUER:
12      Q.   Dr. Pollak, I am running out of time.
13 So, I am going to simplify this.
14          It is true, is it not, that you are not
15 offering an opinion one way or the other as to
16 whether or not the Combat Arms were effective
17 hearing protection devices?  Yes or no.
18      A.   Yeah, I'm not offering an opinion on
19 the -- on the device itself.
20      Q.   Okay. And, so, you don't know what
21 Noise Reduction Rating was listed on the CAEv2
22 packaging.  Is that true?
23      A.   Yeah, that's -- I would just -- I would
24 speculate, yeah.

1

       I, CORINNE T. MARUT, C.S.R. No. 84-1968,

2 Registered Professional Reporter and Certified Shorthand Reporter, do hereby certify:

3        That previous to the commencement of the examination of the witness, the witness was duly

4 sworn to testify the whole truth concerning the matters herein;

5        That the foregoing deposition transcript was reported stenographically by me, was thereafter

6 reduced to typewriting under my personal direction and constitutes a true record of the testimony

7 given and the proceedings had;

       That the said deposition was taken

8 before me at the time and place specified;

       That the reading and signing by the

9 witness of the deposition transcript was agreed upon as stated herein;

10        That I am not a relative or employee or attorney or counsel, nor a relative or employee of

11 such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in

12 the outcome of this action.

13

       *[signature: Corinne T. Marut]*

14     CORINNE T. MARUT, Certified Reporter

15

       (The foregoing certification of this

16 transcript does not apply to any reproduction of the same by any means, unless under

17 the direct control and/or supervision of the certifying reporter.)

18
19
20
21
22
23
24