**EXHIBIT 3**

```
 1                  A P P E A R A N C E S

 2

 3   Plaintiff by:
                    JOSHUA BAUER
 4                  Attorney at Law
                    Reich & Binstock, LLP
 5                  4265 San Felipe Street
                    Suite 1000
 6                  Houston, TX 77027
                    (713) 623-8724
 7                  jbauer@reichandbinstock.com

 8

 9   Defendants by:
                    ERIC D. OLSON
10                  Attorney at Law
                    Bowman and Brooke, LLP
11                  150 South Fifth Street
                    Suite 3000
12                  Minneapolis, MN 55402
                    (612) 672-3298
13                  eric.olson@bowmanandbrooke.com

14

15   Also Present: Jacqueline Brant
                    Michelle Lester
16                  Jamie McCarthy

17

18

19

20

21

22

23

24

25
```

```
 1                  THE REPORTER:  All parties to
 2   this deposition are appearing remotely and have
 3   agreed to the witness being sworn in remotely.
 4   Due to the nature of remote reporting, please
 5   pause briefly before speaking to ensure all
 6   parties are heard completely.
 7                  Counsel, please state your
 8   appearance.
 9                  MR. OLSON:  Good morning.  This
10   is Eric Olson from the law firm Bowman and
11   Brooke on behalf of the 3M defendants.  I have
12   with me today my colleagues Jacqueline Brant,
13   Michelle Lester, and Jamie McCarthy.
14                  MR. BAUER:  Joshua Bauer of
15   Reich & Binstock, LLP, on behalf of the
16   plaintiff.
17              RICHARD S. TYLER, Ph.D.,
18   called as a witness, having been first duly
19   sworn, testified as follows:
20                  DIRECT EXAMINATION
21   BY MR. OLSON:
22       Q.    Thank you.  Doctor Tyler, if you could
23   state your name and spell your last name for
24   the record, please.
25       A.    Richard Sydney Tyler, T-Y-L-E-R.
```

```
 1        A.    Yes, I understand that.
 2        Q.    And like you just heard from the court
 3   reporter a few moments ago, because we are
 4   remote, if you could just wait a second after
 5   you think I'm done speaking before you start
 6   your answer, and I'll try to do the same so we
 7   can avoid cutting each other off.
 8                      And then also that will give
 9   Mr. Bauer a chance to interpose any objections
10   that he might have as we go through the
11   process.  Will that work for you?
12        A.    Yes, I understand.  That works.
13        Q.    Very good.  Thank you.  And, of
14   course, because this is being transcribed by
15   the court reporter, please try to respond
16   verbally to any of my questions, so yes or no
17   or an explanation as opposed to shaking your
18   head yes or no or uh-huh or huh-uh.  Those just
19   don't translate very well and can lead to
20   confusion later.
21        A.    I understand.  Thank you.
22        Q.    Perfect.  If I ask you a question
23   today that's confusing or that you don't
24   understand what I'm asking, please let me know,
25   and I'll rephrase it for you.
```

1    your computer or cell phone unless you have to,

2    you're on call or something like that, in which

3    case certainly leave those on.

4         A.    I have nothing else on.

5         Q.    Perfect.  And then before we begin, I

6    would just ask that everyone except for the

7    witness, the court reporter, and Mr. Bauer mute

8    their audio just so we don't have any

9    interruptions accidentally.

10                   Doctor Tyler, where are you

11   located right now, physically?

12        A.    I am in my office in Iowa City, Iowa.

13        Q.    Is there anyone in your office with

14   you today right now?

15        A.    No, there's not.

16        Q.    Okay.  What documents do you have with

17   you today, Doctor Tyler?

18        A.    No other documents.

19        Q.    Do you have any other documents open

20   on your computer other than the website I asked

21   you to open?

22        A.    No, I do not.

23        Q.    Okay.  So, Doctor Tyler, let's give

24   this technology a shot here.  I'm going to

25   promote an exhibit to that folder.  Give me

```
 1    page 4 of this exhibit, this is Schedule A, and
 2    go down to the document requests section.
 3                    These are four requests t hat
 4    were served with the amended notice of
 5    deposition asking you to produce any documents
 6    or files in your possession that would be
 7    responsive.
 8                    Have you reviewed these four
 9    requests, Doctor Tyler?
10    A.    Yes, I have.
11    Q.    Do you have any documents that are
12    responsive to these requests?
13    A.    No, I do not.
14    Q.    Okay.  So just to clarify, you don't
15    have any notes or anything like that related to
16    your examination of the plaintiff?
17                    MR. BAUER:  Objection, form.
18    A.    No.  I did make some notes when I
19    interviewed her, but I did not keep them.  They
20    all went into my report.
21    Q.    Okay.  Then I'm going to stop sharing
22    here.  And you should have my smiling face back
23    in front of you again.
24                    How much time did you spend
25    preparing for your deposition, Doctor Tyler?
```

```
 1   documents were those?
 2        A.   Well, they were -- I don't recall all
 3   of them.  Certainly my report and some of her
 4   reports and then the hearing evaluation, things
 5   that I thought were relevant to the case.
 6        Q.   By "hearing evaluation," you're
 7   referring to the medical examination that was
 8   performed in this case?
 9        A.   Yes, with the audiograms on it.
10        Q.   Okay.  And did you do any independent
11   preparation other than reviewing those records
12   without any attorneys present?
13        A.   No, I did not.
14        Q.   Did you discuss this deposition or
15   this litigation with anyone other than
16   Mr. Bauer?
17        A.   No, I did not.
18        Q.   Have you ever attended a presentation
19   or training session put on by a Doctor
20   Spankovich related to the 3M litigation?
21        A.   No.  I've been asked that several
22   times, though.  I feel like I'm missing out on
23   something somewhere.
24        Q.   I don't know that it's really that
25   exciting, and I don't think it's terribly
```

Richard S. Tyler, Ph.D.

```
 1        A.   Well, I don't have that in front of me
 2   now.  I think it's probably around 375 for
 3   depositions.
 4        Q.   Okay.  So 80 to $100 more, something
 5   along those lines?
 6        A.   Yes.
 7        Q.   And is that increase across the board?
 8        A.   Except for the travel.
 9        Q.   Okay.  When were you retained by the
10   plaintiff in this case?
11        A.   I don't recall.
12        Q.   So obviously this isn't a memory test.
13   Can you give me an approximate month when you
14   were retained?
15        A.   Well, it would only be approximate.
16   I'm sorry.  I haven't kept track of these
17   things.
18        Q.   So sometime -- but sometime before --
19        A.   Several months ago.
20        Q.   Several months ago, that's fair.  And
21   you submitted your expert report on April 11th
22   of 2022; correct?
23        A.   I'd have to check the date, but that
24   sounds right.
25        Q.   I'm talking about your first expert
```

1    of your case-specific expert report; correct?

2    Do I need to make that larger?  I can't see how

3    large it is on your screen.

4          A.    Yeah, a little bit larger would help.

5          Q.    Sure.  Let me see if I can do that.

6    Is that better?

7          A.    Oh, much better, yes.

8          Q.    So this is the First Amended

9    Case-Specific Report of Doctor Richard Tyler.

10                    Is this the amended report that

11   was served, I believe, yesterday?

12         A.    I believe that's correct, yes.

13         Q.    Okay.  And so I'm just going to scroll

14   down quickly.  I'm not asking you to read this

15   as I go, obviously.  And just down to page 12

16   of your -- the numbered page 12, and that's

17   your signature; correct?

18         A.    Yes, it is.

19         Q.    And dated yesterday?

20         A.    That's correct, yes.

21         Q.    And so what changes did you make to

22   your report between the first report and this

23   amended report?

24         A.    Can we go --

25                    MR. BAUER:  Can I interject?

1   and when you submitted your initial reports,
2   since we've established there was no
3   substantive difference, how many hours did you
4   work on the case?
5       A.   You said from -- after I submitted the
6   report?
7       Q.   I'm sorry.  Before you submitted the
8   report.  So from when you were engaged to when
9   you submitted the report.
10      A.   Oh.  So I would say approximately ten
11  hours.
12      Q.   Approximately ten hours.  And how many
13  of those hours did you spend reviewing
14  documents and records relating to the
15  plaintiff?
16      A.   Those were all related to this case.
17      Q.   Let me sort of put those hours into
18  sort of two buckets, and the first bucket will
19  be reviewing documents and records, and the
20  second would be your evaluation of the
21  plaintiff, and then the third would be writing
22  your expert report.  Okay?
23               So of those three buckets, how
24  many of those hours did you spend reviewing
25  documents and records relating to the

```
 1   your work as an expert in the Combat Arms
 2   litigation to date?
 3               MR. BAUER:  Objection, form.
 4       A.   So I don't have a very good idea how
 5   to answer that.
 6       Q.   I don't want to misrepresent your
 7   testimony here, but I think you've testified
 8   that you've spent ten hours working on the
 9   report, you know, basically prereport and then
10   about four hours preparing for the deposition.
11               So about 14 to 15 hours in this
12   case; is that correct?  Fair enough?
13       A.   Yeah, approximately.
14       Q.   And is that similar for every
15   plaintiff that you've worked on?
16       A.   I'd have to go back and check.  I
17   think several of the other ones were -- I spent
18   more time.
19       Q.   All right.  Have you submitted any
20   invoices related to your work for this case?
21       A.   I don't recall.  I think I did, but
22   I'm not sure.
23       Q.   Okay.  Have you been paid for your
24   work on this case yet?
25       A.   I don't believe so, but I'm not sure.
```

1    since 2016; is that fair?  And there's one on

2    the next page.

3        A.   Yeah.  So this is probably not a good

4    estimate.  It might be approximately right.  I

5    never knew I was supposed to keep track of

6    these, so I did not keep good track of these.

7        Q.   Okay.  But you've listed here three

8    cases since 2016, approximately; correct?

9        A.   Yeah.  It would be one or two more,

10   but I am not sure.

11       Q.   Okay.  And before 2016 have you also

12   testified as an expert witness in litigation?

13       A.   Yes, I have.

14       Q.   About how many times total have you

15   testified as an expert?

16       A.   Well, again, I haven't kept track of

17   those.  I could guess maybe another five or

18   ten.

19       Q.   Okay.  Have you ever testified in any

20   cases relating to hearing protection devices

21   pre 3M?

22       A.   I think that I have.

23       Q.   Do you have any recollection about

24   what that case was about?

25       A.   I think it was somebody shooting a

Richard S. Tyler, Ph.D.

1   that you intend to testify to at trial, if we

2   go to trial in this case?

3       A.   Yes, it does.

4       Q.   Okay.  Other than counsel, did you

5   consult anyone as you were preparing this

6   report?

7       A.   No, I did not.

8       Q.   On page 1 of this report under Summary

9   of Opinions here, it states that you relied

10  upon the general causation opinions of Rich

11  McKinley, Mark Packer, Christopher Spankovich,

12  and refer to them as the general experts.

13              What did that review entail for

14  you?

15      A.   Well, they each had quite lengthy

16  reports, and so I read those reports carefully.

17  Several times, actually.

18      Q.   And did you read those reports

19  specifically for this case or generally for all

20  of the 3M cases?

21      A.   Well, I --

22              MR. BAUER:  Objection, form.

23      A.   I reread them for this case as well.

24      Q.   And you're relying on those reports

25  for your opinions today; correct?

1      A.   Well, I think I did, but I didn't see
2   anything clear that contradicted anything here.
3      Q.   Okay.  As you reviewed these general
4   reports, the plaintiffs' general reports, to be
5   clear, did you disagree with any of those
6   conclusions?
7      A.   Well, I'd have to go back and look at
8   each conclusion that they made.  As I said, I
9   think it was pretty clear to me from looking at
10  the original internal documents from the 3M
11  engineers that the device was not working as it
12  was intended to and they recommended that they
13  be recalled, and the supervisors at 3M did not
14  agree with them and did not recall them.  So I
15  think that's one of the most important things
16  here.
17                MR. OLSON:  I'm going to move to
18  strike as nonresponsive.
19     Q.   Doctor Tyler, I'm going to turn to
20  Exhibit A of your report.  This is a list of
21  case-specific materials relied on; correct?
22     A.   Case-specific materials, yes.
23     Q.   Yes.  You understand that you have an
24  obligation to disclose all of your opinions and
25  the basis for those opinions in your report;

1      A.   Well, specifically, again, I'd have to

2   go back and check what's in Exhibit A, but I

3   thought the initial reports within the 3M

4   company are also related specifically to this

5   case.

6      Q.   Okay.  So the internal 3M documents

7   were also -- should be on this list, and I'll

8   grant you that.

9      A.   Okay.  Thank you.

10     Q.   And as you sit here today, you don't

11  have any plans to prepare a second amended

12  report in this case; correct?

13     A.   At this time the answer is that's

14  correct.

15     Q.   Okay.  So same caveat applies.  If a

16  record, document, or testimony is not on your

17  materials considered list, you haven't reviewed

18  it, is that fair, specific to this case?

19     A.   Specific to this case, that's true.

20     Q.   Okay.  And you've read and considered

21  every document on this list here today;

22  correct?

23     A.   That's correct, yes.

24     Q.   All right.  So then if a document is

25  not on this list, you didn't review it, that's

Richard S. Tyler, Ph.D.

```
 1      Q.   Oh, absolutely.  I'm speaking
 2  specifically to this Exhibit A at this point.
 3      A.   Oh.
 4      Q.   Do you know approximately how many
 5  pages of medical records you received and
 6  reviewed in this case?
 7      A.   No, I do not.
 8      Q.   Okay.  So I think I did some
 9  back-of-the-envelope math, and you've listed on
10  this list, let's say, around between 30 and
11  50 pages of medical records on this list.
12                 Is that a fair sort of addition
13  of the Bates numbers on here?
14      A.   I'd guess that's correct, yes.
15      Q.   Were there other medical records
16  provided or just these?
17      A.   With respect to this particular case,
18  just these.
19      Q.   Would it surprise you to know that
20  there are over 6,164 pages of medical records
21  received from the VA and Department of Defense
22  related to this plaintiff?
23      A.   Well, I guess that large number would
24  surprise me, yes.
25      Q.   So granting that we have 30 to 50
```

1    to the plaintiff's major depressive disorder?

2        A.    Well, I understand she was going

3    through some other things, but I did not review

4    those, no.

5        Q.    Okay.  You haven't reviewed the

6    transcript of the deposition of plaintiff's

7    ex-husband Calvin Lockwood; correct?

8        A.    I'd have to check the records if I

9    did, but I don't remember that.

10       Q.    Okay.  So in this case you reviewed

11   the records that were provided to you by

12   plaintiff's counsel and you didn't ask for any

13   additional records; is that fair?

14       A.    Yes, that's fair.

15       Q.    Okay.  And the plaintiff in this case

16   is Shanika Roper; correct?

17       A.    Correct.

18       Q.    Okay.  I'm going to scroll back up

19   here to the -- I believe it's the bottom of

20   page 1 here of your report.  I'm going to read

21   this last sentence.

22                    It says, "These flaws and the

23   resulting inadequate fit, seal and/or continued

24   seal/retention and the imperceptible loosening

25   of the CAEv2 in Plaintiff while exposed to

1   order that says you are not to get into the
2   drafting of any report, and I can pull that up
3   if you want to go look at it.  But I'm sure you
4   know that it exists.
5                    MR. OLSON:  All right.  Let's
6   move on here.
7       Q.   So, Doctor Tyler, can I get your
8   definition of what tinnitus is as a medical
9   condition?
10      A.   Well, I'd consider tinnitus as a
11  health-related condition.  It's the perception
12  of a sound either generated in the middle ear
13  or in the auditory nervous system when there is
14  no external sound.
15      Q.   Okay.  And then what are the symptoms
16  that are typically associated with tinnitus?
17      A.   Well, they're quite different in
18  different people.  The symptoms are hearing a
19  sound, and the sound perceived can be a
20  popping, ringing noise, can be quite a variety
21  of different sounds.
22                    It can be something that's
23  continuous 24 hours a day.  It can be
24  intermittent.  It can be heard for, you know, a
25  few hours a day, few minutes a day, and every

Richard S. Tyler, Ph.D.

1   tinnitus, because it could be a twitch in the
2   muscle.  I always refer to it as middle ear
3   tinnitus.
4      Q.   Okay.  That's fair enough.  Just
5   correct me if I use the wrong terminology here
6   today·
7                    And then, additionally, what's
8   somatic tinnitus?
9      A.   So somatic tinnitus is a tinnitus that
10  can be modified or changed when someone
11  receives pressure on their neck or their face
12  or their head somewhere, when they clench their
13  jaws.  It's very interesting.  There's not a
14  lot known about it.
15                   I was just asked to lead a
16  whole journal issue on somatic tinnitus, but I
17  couldn't get enough people that felt
18  comfortable with the knowledge of it.
19                   But that's basically what it
20  is --
21     Q.   Okay.
22     A.   -- just being able to change your
23  tinnitus with usually pressure on the head or
24  neck.
25     Q.   And tinnitus is a fairly common

```
 1   tinnitus is described as a subjective
 2   complaint?  I'm leaving aside the objective
 3   tinnitus that we spoke about briefly earlier.
 4        A.   Yes, that's fair.
 5        Q.   Okay.  And that means that there's no
 6   objective diagnostic test to confirm tinnitus;
 7   correct?
 8        A.   Not sensorineural tinnitus.
 9        Q.   And the severity of tinnitus is
10   generally based on the patient's subjective
11   experience; is that fair?
12        A.   That's correct, yes.
13        Q.   How frequently and of what duration
14   must tinnitus occur in order for it to be
15   considered a significant case of tinnitus?
16        A.   Well, a significant case I guess I
17   would define as how it interferes with the
18   individual's life.  So for some people if the
19   tinnitus is -- everybody's different, so that
20   has to be stated very clearly.
21                    For some people the tinnitus is
22   on continuously and doesn't change.  Then one
23   could maybe understand that it's easier to
24   adapt to.
25                    If the tinnitus is intermittent
```

Richard S. Tyler, Ph.D.

1    that indicates that genetics can play a factor
2    in the experience of tinnitus.  There's certain
3    otological -- excuse me -- ototoxic substances,
4    traumatic brain injuries, migraines, other
5    physical conditions.
6                      There's a number of things that
7    can cause or contribute to tinnitus.  That's
8    what I'm getting at.
9        A.    Well, so by using the term "cause" and
10   "contribute," I think that's sort of confusing.
11   First of all, it's not clear in my mind there's
12   any good evidence that genetics has a role to
13   play, at least not yet.
14                      And, you know, by using the
15   word "contribute" it certainly is true that if
16   you have other challenges in your life, you're
17   having trouble at work or having trouble at
18   home and then you get tinnitus, then that's
19   going to -- your tinnitus can make it more
20   difficult to deal with other problems going on
21   in your life.
22       Q.    Okay.
23       A.    That's one way of answering your
24   question.
25       Q.    That's fair.  Doctor Tyler, are you a

```
 1       A.    And I'm not sure that -- I'm usually
 2   there to provide support and counseling, not
 3   diagnosis.
 4       Q.    Okay.  Would it be unusual for you to
 5   only conduct a telehealth visit when you're
 6   diagnosing or conducting a patient exam?
 7       A.    Well, again, by diagnosing an exam --
 8   using the word "diagnosing" and using the word
 9   "exam" is not how I would frame my help to the
10   patient.
11                  I'm there to help them
12   understand what problems they're having and to
13   suggest and help guide them through strategies
14   that might help them reduce the impact of the
15   tinnitus on their life.
16       Q.    Okay.  And so, generally speaking,
17   your testimony is that you aren't really there
18   to diagnose?  You're more to provide support
19   and coping?
20                  I don't want to take words out
21   of your mouth.  So tell me if that's a fair
22   statement or not.
23       A.    Yes, that's a fair statement.
24       Q.    Okay.  Are there any sort of medical
25   tests that you would generally perform to try
```

Richard S. Tyler, Ph.D.

```
1       Q.   Okay.  But with respect to your
2   telehealth visit with the plaintiff, you didn't
3   perform any tests to diagnose tinnitus based on
4   your statement that there aren't any tests to
5   diagnose subjective tinnitus; is that fair?
6       A.   That's correct, yes.
7       Q.   Okay.  Earlier you mentioned that you
8   don't necessarily follow the belief that there
9   may be a genetic component to tinnitus; is that
10  correct?
11      A.   That's correct, yes.
12      Q.   Do you believe there is any genetic
13  component to hyperacusis?
14      A.   There may be.  This has not been well
15  described yet, but I'm not aware of any good
16  data that indicates that it is.
17      Q.   Okay, gotcha.  In your practice do you
18  ever fit patients with hearing protection
19  devices?
20      A.   I often pass out some earplugs, but I
21  don't fit them or guide them along those lines.
22      Q.   Would those be sort of like the foam
23  roll-type earplugs?
24      A.   They would, yes.
25      Q.   Okay.  Do you perform any testing when
```

Richard S. Tyler, Ph.D.

```
 1   ear canal.
 2        Q.   All right.  Do you ever advise
 3   patients who are hunters or recreational
 4   shooters to wear hearing protection devices
 5   when discharging firearms?
 6        A.   Absolutely, yes.
 7        Q.   Okay.  And that's because the noise
 8   from firearms can cause hearing loss and
 9   hearing damage; is that correct?
10        A.   That's correct, yes.
11        Q.   Including tinnitus?
12        A.   Yes, that's correct.
13        Q.   And do you advise your patients who
14   attend sporting events in loud crowds to wear
15   hearing protection devices?
16        A.   Well, that would depend, you know, if
17   it's a sporting event where you're not sitting
18   close to where the noise is and the noise is
19   not impulsive or there all the time.  And the
20   same could be true about crowds in general, but
21   it's good to have hearing protection with you
22   in case those situations are loud.
23        Q.   Okay.  And so to the extent that the
24   crowd noise is loud, that can cause hearing
25   damage or auditory trauma as we discussed, as
```

```
1                    MR. BAUER:  Objection, form.
2        A.    I don't know -- I don't understand
3    your question.
4        Q.    To your knowledge, there is no hearing
5    protection device on the market that can
6    entirely protect a person from hearing damage
7    under the circumstances in which they're
8    exposed to loud noise; correct?
9                    MR. BAUER:  Objection, form.
10       A.    Well, the hearing protection comes
11   with noise reduction ratings, and as long as
12   the noise that that person is exposed to is not
13   above your noise reduction ratings, then that
14   hearing protection would be perfect if they
15   stayed in place after they were inserted.
16       Q.    So what would you consider a safe dBA
17   level for an individual to experience?
18                   MR. BAUER:  Objection, form.
19       A.    Well, without hearing protection I
20   believe it's around -- again, I'd have to check
21   the records on this, and it depends, variation
22   from one individual to another, but it's around
23   60, 65 dBA for an eight-hour shift.
24       Q.    And are you aware that the Army
25   requires the use of double hearing protection
```

Richard S. Tyler, Ph.D.

```
 1      Q.   Let's call it a telehealth visit.
 2      A.   Yes, that's correct.
 3      Q.   And would you describe that as an
 4  examination or an interview?  Is there a
 5  difference in your practice?
 6      A.   Well, this is not something that I
 7  would do -- I don't consider this a clinical
 8  examination.
 9      Q.   Okay.  So this isn't how you would
10  typically diagnose tinnitus in this way;
11  correct?
12      A.   I did not --
13               MR. BAUER:  Objection, form.
14      A.   I did not feel like my role here was
15  to diagnose tinnitus.
16      Q.   Okay.  Was your telehealth visit, was
17  that the first time you ever spoke with the
18  plaintiff?
19      A.   Well, again, I'm not calling this a
20  telehealth visit.  This is something I did to
21  interview her with respect to this case.
22      Q.   Well, that's fair.  Was that
23  interview, then, the first time you've ever
24  spoken with the plaintiff?
25      A.   Yes, it was.
```

Richard S. Tyler, Ph.D.

```
1                    MR. BAUER:  Objection, form.
2         A.    That's correct, yes.
3                    MR. OLSON:  Okay.  Josh, it's
4    been about 55 minutes, and I'm going to change
5    subjects.  Is this a good time to take like a
6    five-minute break?
7                    MR. BAUER:  Sure.
8                    MR. OLSON:  All right.  Then
9    let's take five minutes.
10                   MR. BAUER:  Before we go off the
11   record, I just to want clarify, is it 3M's
12   position that Document 3072 doesn't apply and
13   we're going to start asking about the drafting
14   of expert reports?
15                   Because there have been several
16   typos in you-all's reports that I haven't
17   gotten into.  So I just want to know what your
18   position is on that.
19                   MR. OLSON:  No.  Josh, I'll --
20   okay.  Let's --
21                   MR. BAUER:  No, no, no.  We're
22   going to do this on the record.  I want to know
23   from you whether or not that document still
24   applies in your opinion.
25                   MR. OLSON:  It does apply.  And
```

```
 1   that you've rendered in this case are related
 2   solely to this case and not to any of the other
 3   3M cases; correct?
 4       A.    That's correct, yes.
 5       Q.    All right.  Thank you.  Doctor Tyler,
 6   when you conducted your interview with the
 7   plaintiff in this case, did you ask the
 8   plaintiff to demonstrate how she used the
 9   Combat Arms Earplugs Version 2 when she was in
10   the service?
11       A.    No, I did not.  I did not think that
12   was relevant.
13       Q.    Why wouldn't that be relevant, in your
14   opinion?
15       A.    Well, she was provided instructions on
16   how to do it.  My understanding is instructions
17   came with these devices.
18                     And even if she had put them in
19   properly, they were known to come out on their
20   own, and just watching her put them in once
21   wouldn't really document accurately how well
22   she put them in for her time in the military.
23       Q.    Let's see here.  And, similarly, you
24   didn't personally observe the plaintiff insert
25   any other type of earplug or use any other type
```

1  made molded ear impressions of an individual's

2  ear canals?

3      A.   I probably have a long time ago for

4  fitting hearing aids.

5      Q.   You didn't of this plaintiff; correct?

6      A.   No, I did not.

7      Q.   So just to clarify, you also haven't

8  reviewed any records describing the

9  measurements of plaintiff's ear canals;

10  correct?

11             And I understand that you didn't

12  think it was relevant, but just you haven't

13  reviewed those; correct?

14      A.   I wasn't aware there were any of those

15  measurements.

16      Q.   Okay.  And so what methodology did you

17  use to reach your opinions that you've rendered

18  in this case?

19      A.   Well, my opinions on the inadequacies

20  of the 3M earplugs in question were based on

21  the internal documents of the 3M engineers

22  requesting that they be recalled to their

23  supervisors, the supervisors not doing that

24  and, therefore, the earplugs could come out and

25  not be effective, and the notion that even

Richard S. Tyler, Ph.D.

1    how likely you thought that the Combat Arms

2    Earplugs caused her injuries in this case?

3        A.   No, I did not think that was

4    necessary.

5        Q.   Okay.  If you were to assign a

6    percentage of contribution to the Combat Arms

7    Earplugs Version 2, would that percentage be

8    100 percent, or would it be something less?

9             MR. BAUER:  Objection, form.

10       A.   Well, I would not do that.  It's not

11   possible to know anything with 100 percent

12   accuracy in situations like this.

13       Q.   So there's the possibility of other

14   contributing causes?

15       A.   Yes, I can agree with that.

16       Q.   And are you offering the opinion that

17   the plaintiff would have no tinnitus but for

18   her use of the Combat Arms Earplugs Version 2?

19             MR. BAUER:  Objection, form.

20       A.   Well, again, my understanding was that

21   I only had to be 51 percent sure about that.

22   And so I could say that exposure to noise was

23   the most likely cause here while using these

24   defective earplugs.

25       Q.   And would you agree that the plaintiff

Richard S. Tyler, Ph.D .

```
 1   above the hearing loss.
 2                   And in addition to the hearing
 3   issues then, these things can also get in the
 4   way with your thoughts and emotions, your
 5   concentration, and your sleep ability.
 6        Q.   Okay.  So when you use the phrase
 7   "related injuries," you're sort of talking
 8   about that sort of -- the sequelae that could
 9   come from the tinnitus and hyperacusis that
10   you're discussing; is that fair?
11        A.   That's fair, yes.
12                   MR. OLSON:  All right .  I'm
13   going to bring up another document here.  Give
14   me just a second to find this.  This will be --
15   I believe I'm on Exhibit 3, Madam Court
16   Reporter.
17                   (Exhibit No. 3 was marked for
18              identification by the reporter.)
19                   MR. OLSON:  This is going to be
20   Roper Amended Objections and Responses to
21   Defendant 3M's Amended First Set of
22   Interrogatories to Plaintiff.
23        Q.   And let me see if I can get my screen
24   to share here again.  Let me know if you see
25   that.
```

1    Earplugs or CAEv2s, I'll be referring to the

2    Combat Arms Earplugs Version 2; is that fair?

3         A.   Yes, that's fair.

4         Q.   Okay.  Hopefully that will streamline

5    my questions a little bit at least.

6                   So do you recall what firearms

7    the plaintiff used while at the gun range in

8    the military?

9         A.   No, I do not have that memorized.

10        Q.   You reviewed the plaintiff's

11   deposition in this case; correct?

12        A.   I did, yes.

13        Q.   I can reference to you that she named

14   the M16 rifle and the M9 pistol.  Does that

15   sound correct?

16        A.   That sounds correct, yes.

17        Q.   Do you know the noise emission of the

18   M16 rifle?

19        A.   I don't have that memorized, no.

20        Q.   Does it sound correct that it would be

21   somewhere around 162 decibels for the muzzle

22   blast?

23                   MR. BAUER:  Objection, form.

24        A.   Well, that's not how sound level is

25   measured, so I guess I'm going to say that I

```
 1                    I think we can both agree that
 2   the report of an M16 would be considered to be
 3   a "loud noise"; is that fair?
 4       A.   Yes.  Likely an impulsive noise, yes.
 5       Q.   I can stipulate to that for these
 6   questions at least.  The same for an M9 pistol?
 7       A.   That's correct, yes.
 8       Q.   Okay.  Do you know how often the
 9   plaintiff would train with these firearms?
10       A.   No, I do not.
11       Q.   Do you know what hearing protection
12   the plaintiff used when she was training with
13   these firearms?
14       A.   My recollection is from the review
15   that I said it was not clear what she was
16   using, but I don't know the answer to that.
17       Q.   So we can't be sure today that the
18   plaintiff was using the Combat Arms Earplugs
19   every time she utilized the M16 and M9 firearms
20   at the firing range; is that fair?
21       A.   Yes, I agree with that.
22       Q.   Okay.  And, in fact, I think she
23   testified in her deposition that she used foam
24   earplugs on at least one or two occasions; is
25   that correct?
```

Richard S. Tyler, Ph.D.

```
 1  is that fair?
 2      A.   Well, that would be relevant in this
 3  case, yes.
 4      Q.   And so you just testified that, you
 5  know, one report or one exposure to a loud
 6  sound can cause hyperacusis or tinnitus; is
 7  that correct?
 8      A.   That's correct, yes.
 9      Q.   So if we don't know that, for example,
10  the plaintiff utilized the Combat Arms Earplugs
11  in every situation, then we don't know for sure
12  that her hearing -- or that her tinnitus and
13  hyperacusis were caused by those earplugs; is
14  that correct?
15                MR. BAUER:  Objection, form.
16      A.   Well, I guess one could say that we
17  don't know with 100 percent certainty, but as
18  far as I know the 3M earplugs in question were
19  the only ones identified as being faulty and
20  would come out over time.
21      Q.   Have you reviewed any internal
22  documents from any other manufacturers of
23  earplugs?
24                MR. BAUER:  Objection, form.
25      A.   Well, as I said, I'm not aware that
```

```
 1       A.   Well, I'm not sure that they're
 2   available because there's no other concerns
 3   from other companies.
 4       Q.   But you haven't reviewed those
 5   documents; correct?
 6                MR. BAUER:  Objection, asked and
 7   answered.
 8       A.   I'm not sure there are any other
 9   documents.
10       Q.   I'm sorry.  I need a yes or no answer
11   for the record.  I understand where you're
12   going, but I really would like -- if the answer
13   is no, you haven't reviewed those documents,
14   then I think it's easy to say no.
15                MR. BAUER:  Hold on.  Let me
16   clarify the question just before he answers.
17                Is your question, has Doctor
18   Tyler reviewed documents that we don't know
19   whether they exist for other hearing protection
20   companies of which have not been recalled, has
21   he reviewed their internal documents?
22                MR. OLSON:  Yes.
23                MR. BAUER:  Again, one, he's
24   answered that; two, that has nothing to do with
25   this lawsuit; and, three -- I don't have a
```

```
 1   relevant time period that she would go to the
 2   range and shoot recreationally as well; is that
 3   correct?
 4        A.   Yes, that's correct.
 5        Q.   Do you know what hearing protection
 6   devices the plaintiff used when she was
 7   shooting recreationally?
 8        A.   No, I do not.
 9        Q.   All right.  Do you know whether the
10   plaintiff used hearing protection devices while
11   she was shooting recreationally?
12        A.   I don't recall specifically.  I think
13   when I did talk to her about this she said she
14   wore them sometimes, but not all the time.
15        Q.   Okay.  Are you aware that the
16   plaintiff attended athletic events, let's say,
17   professional athletic events with her
18   ex-husband, Calvin Lockwood?
19        A.   Yes.
20        Q.   And you're aware that she attended
21   Atlanta Falcons games; correct?
22        A.   Yes.
23        Q.   Let's see here.  Are you aware of
24   the research indicating that the average
25   decibel level at an NFL game ranges from 85 to
```

```
 1   for long periods of time, but it is potentially

 2   damaging noise if it's on all the time on a

 3   regular basis for days and days.

 4        Q.   And you're aware that Ms. Roper

 5   attended Atlanta Hawks games with her

 6   ex-husband as well; correct?

 7        A.   That's correct, yes.

 8        Q.   And, again, I'm not going to get into

 9   the specific decibels because of your prior

10   answer, but you're aware that inside NBA arenas

11   it does become extremely loud; correct?

12        A.   Well, again, it depends how you define

13   "extremely loud," and particularly if you're

14   sitting close to a band, especially if somebody

15   is beating on a drum in the band, that would be

16   potentially damaging.

17                    Simple applause and cheering

18   and things only when there's a special event

19   like a goal or something like that, that,

20   generally speaking, would not be terribly

21   threatening to your hearing ability.

22        Q.   But you'd agree that at an NBA game

23   there are moments, for example, when someone

24   scores a basket or something along those lines

25   where the noise could become dangerous in
```

1      Q.    Okay.   When plaintiff was deployed to

2   Iraq, does it sound right for that to be within

3   the years of 2003 to 2004?

4      A.    I'd have to look at the reports, but

5   that sounds reasonable.

6      Q.    I can represent to you that that's

7   what she testified, that it was 2003 to 2004,

8   but she couldn't remember the months.

9      A.    Okay, that's fine.

10     Q.    What is your understanding of the

11  plaintiff's job duties while she was deployed

12  to Iraq?

13     A.    I'd have to go back and review the

14  records specifically here.

15     Q.    Does it sound right to you that she

16  was an administrative clerk and a mail clerk

17  while she was deployed to Iraq with her unit?

18     A.    I believe that's correct, yeah.

19     Q.    I'd be happy to point you to the

20  deposition, you know, where she says it in the

21  deposition, but just to move this along.

22     A.    Yeah, that's fine.   That rings a bell,

23  yes.

24     Q.    Okay.   And you're aware that she

25  testified that while she was working in the

```
 1   Mr. Lockwood's deposition testimony; is that
 2   correct?
 3       A.   I don't recall if I did or not.
 4       Q.   Okay.  In his testimony -- and let me
 5   know if you'd like me to bring it up.  I
 6   certainly can.
 7                 He described the building which
 8   is located at Baghdad International Airport as
 9   being the site of constant explosions, rocket
10   fire, and small arms fire and described the
11   situation where a plane was hit by a mortar
12   while it was on the tarmac.
13                 Are you familiar with that?
14                 MR. BAUER:  Objection, form.
15   Show that to him.
16       Q.   Okay.  I'll come back to that after
17   our next break so I don't waste time pulling it
18   up, so I'll come back to that then.
19       A.   Okay.
20       Q.   A few minutes ago I showed you the
21   plaintiff's response to Interrogatory 6, and
22   the other was -- we talked about the gun ranges
23   or the firing ranges, excuse me, and she also
24   indicated in that response that her exposure
25   was to military vehicles; is that correct?
```

Richard S. Tyler, Ph.D.

```
 1   military forklift?
 2      A.   Yes, I recall that.
 3      Q.   And earlier we had noted that she
 4   wasn't wearing hearing protection when she was
 5   working in that mail building.
 6              Are you aware of the level of
 7   noise exposure that could be caused by that
 8   military forklift?
 9      A.   Well, it would depend precisely on the
10   distance, and I presume the forklift -- I
11   haven't seen any data on the dBA levels
12   produced by that, and it's not clear how long
13   during the day and how close she would be to
14   the forklift, so --
15      Q.   Okay.
16              MR. BAUER:  I objected on mute.
17   Sorry.  Objection, form.
18              MR. OLSON:  Okay.  Fair enough.
19      Q.   Do you recall that the plaintiff
20   testified that she would wear the Combat Arms
21   Earplugs while she was -- at least some of the
22   time while she was on the firing ranges?
23              Do you recall which end she wore
24   at the time?
25      A.   No, I did not -- I think that was in
```

```
 1   was shooting recreationally.
 2               MR. BAUER:  Objection, form.
 3        A.    I'm not sure why this is a relevant
 4   question.  I don't understand the question
 5   perhaps.
 6        Q.    Okay.  The number of -- just in terms
 7   of noise exposure, you'd agree that the dose of
 8   noise that an individual was receiving depends
 9   on a number of factors, including perhaps, as
10   we discussed earlier, the number of shots that
11   are fired, sort of the volume of noise
12   produced, whatever the units you want to use
13   are, by the firearms, but then also the number
14   of other service members that are firing
15   weapons at the same time?
16                      I'm asking you whether that last
17   piece is fair.
18        A.    I'm sorry.  Yes, that is important,
19   yes.
20        Q.    And we don't know the answer to that
21   question today, do we?
22        A.    That's correct, we do not.
23        Q.    Either for the military or for when
24   she was shooting recreationally?
25        A.    That's correct, yes.
```

Richard S. Tyler, Ph.D.

```
 1      Q.   Let's see here.  I'm switching
 2   documents.  I accidentally closed your report.
 3   Give me just a second and I can bring that up
 4   as well here.
 5               Okay.  Actually, let's see here.
 6   I'm going to -- instead of your report, I'm
 7   going to bring up the plaintiff's deposition
 8   here.
 9               MR. OLSON:  This is going to be
10   Exhibit -- am I on 4 now?
11               MR. BAUER:  Yes.
12               MR. OLSON:  Perfect.
13               (Exhibit No. 4 was marked for
14          identification by the reporter.)
15      Q.   All right.  And let me make this a
16   little bit larger for you.
17      A.   That's good.  Thank you.
18      Q.   Okay.  Perfect.  And I'm going to
19   direct you to page 49, and line 4 through 6
20   here.
21      A.   Okay.
22      Q.   It states, "What vehicles did you
23   operate?"
24               "The Humvee and the deuce and a
25   half, those."
```

```
 1   for example, the speed and the load and things
 2   of that nature; correct?
 3                 MR. BAUER:  Objection, form.
 4       A.   Well, I suppose that it would.  Again,
 5   I think that most of the noise -- I would
 6   assume it's much louder outside, closer to
 7   where the engine is than it is internal, where
 8   the Humvee is designed so that you can talk to
 9   somebody sitting beside you, but I don't know
10   any details on the difference between the noise
11   levels in the Humvees.
12       Q.   Do you know whether the Humvee that
13   the plaintiff rode in had a weapons placement
14   or other openings in the outside of the
15   vehicle?
16       A.   No, I do not.
17       Q.   Do you know the number of trips the
18   plaintiff made in the Humvee?
19       A.   No, I do not.
20       Q.   Okay.  Do you know whether the
21   plaintiff wore hearing protection devices every
22   time that she rode in the Humvee?
23       A.   My understanding is that she did not.
24       Q.   And do you know which hearing
25   protection device she used when she rode in the
```

1    noises would typically be continuous noise as

2    opposed to impulsive noise and would highly

3    depend on the duration.

4                    And, again, if you're exposed

5    to a noise for eight hours in a factory where

6    the noise is continuous all the time, that's

7    more dangerous than if the noise is present for

8    20 seconds after the fans are cheering for an

9    event and then the noise is reduced

10   substantially for ten minutes before the next

11   event.

12                   So I know that these noises

13   could be potentially dangerous in sports

14   events, but generally speaking they're not.

15   Q.   When we're talking about noise-induced

16   exposure, and you had mentioned earlier, I

17   believe, that the thresholds for -- correct me

18   if I'm misstating your testimony here -- that

19   the thresholds for noise exposure in an

20   eight-hour day is 85 decibels per OSHA; is that

21   correct?

22   A.   Well, it would be dBA.

23   Q.   DBA, excuse me.

24   A.   I don't recall explicitly.  That

25   sounds approximately correct.

```
 1       Q.   So, for example, if a person could be
 2   expected to safely be exposed to 85 dBAs over
 3   an eight-hour shift per OSHA, it would be a
 4   substantially shorter amount of time if that
 5   noise dose was at 95 dBAs; correct?
 6       A.   That's correct, yes.
 7       Q.   And even shorter if it was at
 8   105 dBAs?
 9       A.   Absolutely, yes.
10       Q.   And at some point you reach a level
11   where there is no safe period of time of
12   exposure; is that fair to say?
13       A.   That's correct, although there is a
14   lot of individual variability.
15       Q.   Understood.  I can completely concede
16   that.
17                 If the plaintiff were wearing
18   the Combat Arms Earplugs Version 2 to an
19   athletic event, would you recommend that she
20   wear the green end or the yellow end?
21            MR. BAUER:  Objection, form.
22       A.   I haven't memorized which is the one
23   for the impulsive noises, but, again, so that
24   would --
25       Q.   Well, I can represent to you that the
```

```
1                    MR. BAUER:  Thank you.
2       Q.   Doctor Tyler, when did the plaintiff
3   start using Combat Arms Earplugs during her
4   service?
5       A.   I don't recall.  I'd have to go back
6   and look at the record.
7       Q.   Would it be fair to say that it was
8   prior to her deployment to Iraq in 2003?
9       A.   I don't recall.  I'd have to go back
10  and look.
11      Q.   Okay.  Do you recall seeing an
12  audiogram from 2005 that reflected that she
13  reported using hand-formed earplugs at that
14  time?
15                   MR. BAUER:  Objection, form.  If
16  you're going to ask about a document, please
17  show it.
18      A.   Yeah, can you show it to me, please?
19      Q.   I'll pull it up when we go to break
20  here.  I'll ask a couple more questions first,
21  though.
22                   Are you offering an opinion
23  today that safer alternative earplug designs
24  were available which would have reduced or
25  eliminated the plaintiff's risk of
```

1   inadequacy recognized by their internal

2   engineers because this has been devastating for

3   people in the military and been devastating

4   financially for 3M since this thing started.

5   So I think this is a real major issue that's

6   going to have an impact on the future.

7       Q.   Just to clarify -- and I don't want

8   to, you know, misrepresent your testimony.

9                   Your testimony is that, leaving

10  aside the sort of logical steps that a

11  manufacturer, you know, would want to ensure

12  that they don't have a problematic product on

13  the market, at this point you don't know that

14  these alternative designs are not problematic;

15  correct?

16                   MR. BAUER:   Objection, form.

17      A.   There's no evidence I've seen that

18  suggests they're problematic.

19                   MR. OLSON:   Okay.  Josh, I think

20  we've been going for about another 55-ish

21  minutes.  Do you want to take another

22  five-minute break now?

23                   MR. BAUER:   Sure.

24                   MR. OLSON:   I'll try to find

25  those two documents that I mentioned and so we

```
 1   that would have exposed Ms. Roper to excessive
 2   levels of noise?"
 3                 Answer, "Definitely.  So there
 4   was several rocket attacks, mortar attacks.
 5   There was small arms fire in -- on that
 6   location.  Like, that went for the entire time
 7   that I was there.  So it was a multiple --
 8   multitude" -- excuse me -- "of loud -- incoming
 9   loud booms that we were susceptible to."
10                 And then it says, "Okay.  Can
11   you recall any -- any -- any mortar attacks or
12   rocket attacks that may have been particularly
13   close to the mail sorting facility?"
14                 Answer, "There may have been an
15   incident where a plane was hit that was
16   actively on the tarmac from a mortar attack."
17                 So, Doctor Tyler, referring to
18   that testimony related to the noise exposure at
19   Baghdad Airport, would you describe the
20   exposure to these type of noise as potentially
21   hazardous?
22                 MR. BAUER:  Objection, form.
23        A.   Well, again, it's really hard to know.
24   It would depend on, you know, how far the --
25   you know, the incident was from the actual room
```

```
 1              MR. BAUER:  Same objection.
 2       A.   Well, I tried to consider all of the
 3  noise that she was exposed to.
 4       Q.   If you knew that the plaintiff were to
 5  be exposed to this type of noise, would you
 6  recommend that she wear hearing protection
 7  devices?
 8       A.   Well, it's not clear how far away she
 9  was from the noise and if the noise was
10  potentially dangerous.  And if it wasn't, then
11  wearing a hearing protection device might have
12  impacted her office job, communication.
13       Q.   All right.  Let me close out of that.
14  I'm going to move on.
15              Doctor, I'm going to show you
16  another document.  I'm just going to leave it
17  up on the screen here but just switch over.
18              This is an audiogram dated
19  December 3rd of 2009.  And do you see that on
20  the left side here?
21       A.   I do, yes.
22              MR. BAUER:  You need to mark it,
23  Counselor.
24              MR. OLSON:  Oh, sorry.  I'll
25  mark this as Exhibit 6.
```

```
 1  audiogram.
 2                  MR. BAUER:  Wait, but just for
 3  my clarification, you're referring to in 2006,
 4  but this is a 2009 document, isn't it?
 5                  MR. OLSON:  Yep.  This is what I
 6  had been thinking of.
 7                  MR. BAUER:  Okay.
 8                  MR. OLSON:  I'm clarifying on
 9  the record here that this is the document I was
10  referring to.  So to the extent that I referred
11  to a different audiogram earlier, I'm going to
12  move to strike that from the record here.
13                  MR. BAUER:  Understood.  Thank
14  you for the clarification.
15      Q.  Doctor Tyler, earlier we discussed
16  that there are certain ototoxic medications
17  that can be a factor in tinnitus; correct?
18      A.  Correct.
19      Q.  And in your report you listed a very
20  large number of medications; correct?
21      A.  Correct.
22      Q.  Just a second here.  Let me stop
23  sharing my screen here for a moment.  I'll find
24  your report here again.  I've got too many
25  windows open.  Again, my apologies.
```

```
 1   bit further, you see where it says ibuprofen on

 2   your list here?

 3       A.    I do, yes.

 4       Q.    And then also over on this other side

 5   it says naproxen; correct?

 6       A.    Yes.

 7       Q.    Ibuprofen and naproxen are

 8   nonsteroidal antiinflammatory drugs; correct?

 9       A.    I'd have to check, but I believe

10   that's true.

11       Q.    Commonly referred to as NSAIDs;

12   correct?

13       A.    I believe that's true.

14       Q.    And NSAIDs have generally been -- have

15   been found to have ototoxic effects; correct?

16       A.    Well, several medications are listed

17   in part because the companies want to prevent

18   themselves from being sued.  If they have a

19   warning of a hearing loss and tinnitus and

20   hyperacusis, some of the companies do that,

21   although the likelihood of getting hearing

22   loss, tinnitus, and hyperacusis from most of

23   the medications is very low.

24       Q.    Okay.  Are you aware of any medical --

25   any sort of consensus in the medical community
```

1    frequencies and create a noise-induced notch.

2                    So we can see in this audiogram

3    there's a noise-induced notch at 6,000 hertz in

4    the left ear and looks like at 6,000 hertz in

5    the right ear, so that's consistent with a

6    noise exposure, not consistent with a hearing

7    loss due to medications.

8        Q.   Doctor, a general question.  Is it

9    possible to have a noise notch when you don't

10   have evidence that the hearing improves?

11                   So, for example, looking at

12   these 6,000 hertz levels, there's no 8,000 or

13   10,000 where we can see that notch kick back

14   up; is that correct?

15       A.   That's correct.

16                   MR. BAUER:  Objection, form.

17       A.   But we do -- you know, it doesn't

18   always -- it depends on the severity, and there

19   is also some more recent evidence that suggests

20   that the noise exposure can create high

21   frequency losses above 6,000 and above 8,000

22   hertz.

23       Q.   And just to clarify -- maybe this is a

24   question for Josh.  There is no hearing loss

25   claim here, correct, in this case?

1      Q.   Doctor, do you recall when the

2   plaintiff's tinnitus began?

3      A.   No, I do not.

4      Q.   I can report that -- I can represent

5   to you that the plaintiff reported that it

6   began in around 2015, I believe, and then it's

7   reflected in the medical records on July 7th of

8   2017.

9              Does that sound correct?

10     A.   Yes, it does.

11     Q.   Okay.  And isn't it true that the

12  plaintiff denied tinnitus in her medical

13  records on a number of occasions surrounding

14  that time?

15     A.   Yes, that's true.

16     Q.   Leaving aside the DME results from

17  earlier this year, do you have any objective

18  basis to confirm plaintiff's tinnitus?

19     A.   No.

20              MR. BAUER:  Objection, form.

21     A.   There's no objective test for

22  tinnitus.

23     Q.   That's because it's a subjective

24  report; correct?

25     A.   That's correct, yes.

1    tinnitus, understanding that there's no -- at
2    this point I don't believe there's a documented
3    cure for tinnitus.
4        A.    There's no documented cure, that's for
5    sure.
6        Q.    But there are various mechanisms that
7    can be used to address that tinnitus; correct?
8                  MR. BAUER:  Objection, form.
9        A.    There are several counseling and sound
10   therapy strategies which have been shown to be
11   helpful for some patients.
12       Q.    Okay.  For your opinion today where
13   you have stated to a reasonable degree of
14   medical certainty that the Combat Arms Earplugs
15   are the cause of the plaintiff's tinnitus and
16   hyperacusis, you ruled out civilian noise
17   exposure; correct?
18       A.    Well, that's a potential factor, but
19   my understanding was I only had to propose an
20   opinion of 51 percent certainty.
21       Q.    Okay.  And, similarly, you ruled out
22   hearing loss that could have occurred -- excuse
23   me -- tinnitus that could have been the result
24   of a noise exposure while the plaintiff was
25   using other hearing protection in the military;

Richard S. Tyler, Ph.D.

```
 1   that is the description that the plaintiff

 2   gives to tinnitus.

 3        A.    I'm not sure I understand your

 4   question.

 5        Q.    Well, some plaintiffs -- for example,

 6   some people describe it as a ringing or buzzing

 7   sound, something like that.

 8              MR. BAUER:  Objection, form.

 9   Can you just restate the question, please,

10   Counsel?

11              MR. OLSON:  Absolutely.

12        Q.    Do you recall how the plaintiff

13   describes her experience of tinnitus?

14        A.    No, I don't.  It must be in my report,

15   though.

16        Q.    Okay.  I am going to bring up again

17   the plaintiff's deposition, Exhibit 4.

18              So, Doctor, I'm going to again

19   show my screen here, and if you look here on

20   page 90, line 18 -- oh, sorry.  It hasn't gone

21   through yet.

22              Now can you see my screen?

23        A.    I can now, yes.

24        Q.    Perfect.  On page 90, line 18 here,

25   the question starts, "Are you experiencing
```

1   sensorineural tinnitus?

2      A.   It's not typical, but I have seen it.

3   Again, it's difficult for people to explain it

4   to other people that don't have it, so it can

5   be complicated in some people to try and

6   explain what it sounds like to others.  And it

7   doesn't have to sound like a pure tone, and if

8   it comes and goes, it can be complicated to

9   explain.

10     Q.   Okay.  Is it more common to have this

11  type of description of pressure or itch, pain

12  when it comes to somatic or somatosensory

13  tinnitus?

14     A.   So I guess I don't know the answer to

15  that.  You know, as I said, the somatosensory

16  tinnitus there's not as much known about it,

17  and I'm not sure -- I know that the most

18  important definition is that it can be

19  influenced by, as I said, movement and pressure

20  and touch on the head and face, but I don't

21  know that -- I don't have memorized the

22  specifics about how it's defined, described

23  differently, if it is.

24     Q.   All right.  When it comes to

25  arthralgia of bilateral TMJ -- I'll just use

```
 1    exposure and consistent with noise-induced

 2    tinnitus and not some temporomandibular joint

 3    cause of tinnitus or hyperacusis.

 4         Q.    Did you consider and rule out the

 5    plaintiff's major depressive disorder as a

 6    cause or contributing factor to her tinnitus?

 7         A.    Depression does not cause tinnitus.

 8         Q.    Okay.  So that's a yes, you ruled that

 9    out?

10         A.    I did, yes.

11         Q.    Okay.  What about the plaintiff's

12    history of migraines?

13         A.    Migraines does not cause tinnitus.

14    There might be a symptom affecting your

15    auditory system and your brain in general that

16    causes both migraines and tinnitus, but

17    migraines themselves don't cause tinnitus.

18         Q.    Okay.  How about, are you aware that

19    the plaintiff has sleep apnea?

20         A.    I am, yes.

21         Q.    And you're aware that the plaintiff

22    has not consistently treated her sleep apnea

23    with a CPAP machine?

24         A.    I don't know a lot about sleep apnea.

25    Talking to some patients, I know they don't
```

```
 1      Q.   Okay.  And then the plaintiff was also
 2  involved in a car accident, I believe, in
 3  around 2017.  Do you recall that?
 4      A.   I do, yes.
 5      Q.   Are you aware of whether the air bag
 6  went off in that collision?
 7      A.   I forget at this point.
 8      Q.   If an air bag were to deploy in a car,
 9  could that cause hearing damage, including
10  tinnitus?
11               MR. BAUER:  Objection, form.
12      A.   Yes, it can, if it creates an
13  impulsive noise.
14      Q.   Let's turn for a minute to
15  hyperacusis.  What's your definition of
16  hyperacusis?
17      A.   Well, I've written a review article on
18  this many years ago and so, generally speaking,
19  I can just say that hyperacusis is when
20  moderately intense sounds are very, very loud,
21  perceived as very loud.
22      Q.   And is that definition generally
23  accepted within the medical community?
24      A.   I think it is in the audiological
25  community, yes.
```

```
 1    the reports that I heard from her --
 2         Q.    And --
 3         A.    -- were consistent with hyperacusis.
 4         Q.    I apologize.  I didn't mean to
 5    interrupt you there.
 6                    What type of hyperacusis have
 7    you diagnosed the plaintiff with, cochlear or
 8    vestibular?
 9                    MR. BAUER:  Objection, form.
10         A.    So the different types of hyperacusis
11    that I've suggested with my colleagues in this
12    literature have to do primarily, I guess, with
13    loudness, annoyance, fear, and pain
14    hyperacusis.
15                    And I didn't go into any great
16    detail with her hyperacusis, but I could say
17    that my perspective is that she has loudness
18    hyperacusis.
19         Q.    Are you aware of whether there is an
20    ICD-10 code for hyperacusis?
21         A.    I am not aware, actually.
22         Q.    Okay.  Are you aware of whether
23    hyperacusis is associated with migraines?
24         A.    Well, I'm sure it can be.  As I said,
25    it can be caused by many different things.
```

1  was a relationship like that in some clients.

2      Q.   Have you eliminated TMJ dysfunction as

3  a potential cause or contributing factor to the

4  plaintiff's hyperacusis?

5              MR. BAUER:  Objection, form.

6      A.   Well, it might have contributed to it,

7  but, again, one of the most common causes is

8  noise exposure.

9      Q.   Okay.  And there's also an association

10 between PTSD and hyperacusis; is that correct?

11             MR. BAUER:  Objection, form.

12     A.   Well, again, posttraumatic stress

13 disorder implies that somebody has witnessed or

14 been involved in a trauma of some sort, and

15 that trauma might have been an explosion, you

16 know, a gun going off or seeing somebody else

17 and that might result in tinnitus, hyperacusis,

18 and might involve a result of stress just from

19 watching somebody else being injured, so those

20 things certainly can be related to each other.

21     Q.   Okay.  And then I think I know your

22 answer, but the same question with respect to

23 the major depressive disorder that the

24 plaintiff has been diagnosed with.

25     A.   Yeah, well --

1   I think I may be ready to wrap up here.

2              MR. BAUER:  Sure.  We can go off

3   the record.

4              MR. OLSON:  Okay.  Let's go off

5   the record for a couple minutes here.

6              (A recess was taken.)

7       Q.   Doctor Tyler, I just have a couple

8   more questions to wrap up here.  I'm going to

9   share my screen hopefully just one more time.

10  Let me know when you see that.

11      A.   I see it.

12      Q.   This is, for the record, Exhibit 2,

13  the plaintiff's amended report, on page 11 of

14  the case-specific report.

15              Does that seem correct to you,

16  Doctor Tyler?

17      A.   Yes.

18      Q.   Okay.  And I'm just referring -- so we

19  talked for a while about ototoxic medication,

20  and you state here in that that, "She has no

21  significant use of ototoxic medications that

22  contributed to her tinnitus or hyperacusis."

23              Is that still your opinion after

24  our discussion?

25      A.   Well, yeah.  As I said, you know, I

1    hyperacusis?

2        A.    Well, maybe I should have been clearer

3    that, you know, I think those other conditions

4    you just mentioned, as we've discussed, do not

5    cause tinnitus or hyperacusis, but it certainly

6    is true that if she had those before she had

7    her tinnitus and hyperacusis, then getting

8    tinnitus and hyperacusis would make it more

9    problematic for her to deal with her tinnitus

10   and hyperacusis if she was already stressed out

11   or had trouble sleeping because of those other

12   conditions.

13       Q.    Okay.  And, Doctor Tyler, up above in

14   this paragraph here, it states that you

15   considered a variety of potential causes and

16   some of those you go into below at additional

17   length; correct?

18       A.    Correct.

19       Q.    One of the ones that you didn't go

20   into at additional length includes hearing

21   protection device use.

22                    And given that we've discussed

23   today that -- and I don't want to -- so please

24   correct me.  I don't want to mischaracterize

25   your testimony, so correct me if I do -- that

 1  using them certainly has not been shown to be

 2  defective and I think that, you know, just

 3  generally speaking for all of us when there is

 4  some clear upcoming event that we know we're

 5  going to be potentially exposed to loud noise

 6  that we would be wearing hearing protection.

 7                    And if she was wearing the

 8  3M earplugs in general, that could be real

 9  trouble.  If she was wearing some other

10  earplugs when that happened, that would not be

11  so dangerous.

12       Q.   Can you state with certainty that when

13  Ms. Roper knew that there was an upcoming event

14  where she would be exposed to loud noise that

15  she did in all circumstances wear hearing

16  protection?

17       A.   No.  I'm pretty sure she did not in

18  all circumstances, but I tried to make a

19  general comment.

20                    MR. OLSON:  I will pass the

21  witness over to you, Josh.

22                    MR. BAUER:  I have a few

23  questions.  Can you stop sharing your screen,

24  please?

25                    MR. OLSON:  I absolutely can.

```
1        A.   I do, yes.
2        Q.   And then we go down to line 24 on
3   page 97.  The question is, "Okay.  Is there any
4   ringing or like a high-pitched noise or buzzing
5   in your ear" -- and we go onto page 98 --
6   "associated with it?"
7                 Answer, "Sometimes ringing."
8                 Question, "Okay.  Has that
9   occurred in both ears or just one?"
10                Answer, "Both."
11                Question, "How would you
12   describe the ringing?"
13                Answer, "Almost like if somebody
14   is ringing a bell standing next to me."
15                Do you see where I was reading
16   from?
17       A.   Yes, I do.
18       Q.   In your opinion, does that comport
19   more with sensorineural tinnitus?
20       A.   Absolutely.  It's more much probable
21   to experience a ringing.
22       Q.   And that type of ringing would not be
23   associated with something like somatic
24   tinnitus; true?
25       A.   That's correct, yes.
```

```
 1      A.   Yes.
 2      Q.   And do you consider those foam
 3   earplugs to be a safer alternative than the
 4   Combat Arms Earplugs?
 5      A.   Absolutely, yes.  I use them myself.
 6      Q.   Okay.  And are you familiar with
 7   triple-flange hearing protection?
 8      A.   I am, yes.
 9      Q.   And do you know whether or not
10   triple-flange hearing protection was given to
11   members of the military on a regular basis?
12      A.   I think it was, yes.
13      Q.   Okay.  And would you consider
14   triple-flange hearing protection to be a safer
15   alternative to the Combat Arms Earplugs?
16      A.   Absolutely, yes.
17      Q.   Okay.  And are you familiar with the
18   Peltor tactical communication headset that was
19   given to soldiers in the military?
20      A.   I am, yes.
21      Q.   And does it comport with your
22   understanding that the defendants in this case
23   make the Peltor hearing protection device?
24      A.   That's correct, yes.
25      Q.   Would you consider the Peltor hearing
```

Richard S. Tyler, Ph.D.

1    contributed to her tinnitus or hyperacusis."

2                  You were asked about that

3    previously; right?

4        A.   Correct.

5        Q.   And it would be more accurate to say

6    she has no other health condition that could

7    have caused her tinnitus or hyperacusis; true?

8        A.   That's correct.  It should have said

9    "caused."

10       Q.   All right.  So do you plan on

11   correcting that in an amended report, to

12   correct both that and the use of Ms. Jumanah at

13   the top?

14       A.   Yes, I do.

15                  MR. BAUER:  Okay.  No further

16   questions.  Pass the witness.

17                  MR. OLSON:  Sorry.  For some

18   reason, Josh, I objected to form on the last

19   one.  I just couldn't get unmuted for some

20   reason, like the mute button was below the

21   bottom of my screen or something.  I just

22   wanted to put that on the record.

23                  I just have, I think, a

24   couple of -- just a couple very quick

25   questions.

```
 1                    "Maybe five at most."
 2                    Question, "I was about to say,
 3    that feels like an unfair question for a mom
 4    with three boys in the house (audio distortion)
 5    teenager.  Okay.  Is that more or less sleep
 6    than you were getting in about 2014, 2015?"
 7                    Answer, "It's about the same."
 8                    Doctor, did I read it more or
 9    less correctly?  I think I stumbled once.
10         A.    Well, yes, but I'll say that, you
11    know, you're going back asking her things from
12    several years ago, and she did say it was
13    about, you know, about the same.  So it's an
14    approximation on her part.
15         Q.    Just based on the documents that
16    you've reviewed, the plaintiff first reported
17    experiencing tinnitus in 2014 or 2015 and first
18    reported it to her physician in 2017; is that
19    correct?
20         A.    That's correct, yes.
21         Q.    And so despite -- let's go on and look
22    at the top of page 108 here, and "Is that,"
23    referring back to if she was getting sleep,
24    "impacted in any way by your tinnitus, or is
25    that just sort of the sleep pattern you are
```

```
1                    MR. BAUER:  Okay.  I don't think
2    I get to go again if I wanted to.
3                    MR. OLSON:  All right.  Then,
4    Doctor Tyler, I think that's it.  Josh, do you
5    mind if I ask just one wrapping up question?
6                    MR. BAUER:  Go for it.
7        Q.  (By Mr. Olson) Doctor Tyler, have you
8    been able to hear all of the questions that
9    I've asked today?
10       A.  I have, yes.
11       Q.  And you don't have any answers that
12   you've made that you feel the need -- you feel
13   like you'd like to clarify at this point;
14   correct?
15       A.  That's correct.
16                   MR. OLSON:  All right.  That's
17   all I've got.  Thanks, Josh.  I missed that
18   before I passed the first time.
19                   MR. BAUER:  No problem.  Let's
20   go off the record.
21                   (Deposition concluded at 12:05 p.m.)
22                   (UNLESS OTHERWISE DIRECTED BY
     COUNSEL OR THE PARTIES HERETO, THE STENOGRAPHIC
23   NOTES FOR THE FOREGOING DEPOSITION SHALL BE
     DESTROYED AFTER A PERIOD OF 3 YEARS FROM THE
24   DATE OF TAKING OF SAID DEPOSITION.)
25
```